## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

U.S. DISTRICT COURT
BANGOR, MAINE
RECEIVED AND FILED

2016 SEP 16 P 1: 36

BY_____

| | |
|---|---|
| DEBORAH HUARD<br>DIEDRE M. DiGIACOMO<br>and<br>CHERI A. CAUDILL,<br><br>       Plaintiffs<br><br>vs.<br><br>KENNEBEC COUNTY SHERIFF'S OFFICE,<br>KENNEBEC COUNTY SHERIFF'S OFFICE,<br>     CORRECTIONS DIVISION,<br>KENNEBEC COUNTY CORRECTIONAL FACILITY,<br>RYAN REARDON, in his official and individual capacity,<br>MARSHA ALEXANDER, in her official and individual capacity,<br>CALISTA CAMPBELL, in her official and individual capacity,<br>LAURA BRIGGS, in her official and individual capacity,<br>JESSICA QUINN in her official and individual capacity,<br>DENNIS CYR in his official and individual capacity,<br>TERRY YORK in her official and individual capacity, AND<br>COMMISSIONER DR. JOSEPH FITZPATRICK, MAINE<br>DEPARTMENT OF CORRECTIONS<br><br>       Defendants | DOCKET No. 1:16-cv-00473-GZS |

## COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs Diedre M. DiGiacomo, Deborah Huard and Cheri A. Caudill, by and through their attorney, Jackie T. DiGiacomo, Esq. and for their complaint against defendants Kennebec County Sheriff's Office, Kennebec County Correctional Facility, Maine Department of Corrections, Ryan Reardon, Marsha Alexander, Calista Campbell, Laura Briggs, Jessica Quinn and Dennis Cyr hereby state as follows:

1) Plaintiffs sue the Defendants, as individuals and in their official and unofficial capacities, for violating Plaintiffs' rights, for engaging in racketeering and other prohibited activities, for engaging in criminal conspiracy, theft by extortion, bribery in official matters, improper influence, purchase of a public office, obstructing government administration, official oppression, and for directly and proximately causing mental anguish, severe emotional distress, emotional pain and suffering.  This criminal activity has resulted in the wrongful termination, constructive termination and forced premature retirement to the detriment of all Plaintiffs.  As grounds therefore, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

2) This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States.  In this Complaint, there arise there arise claims in the Complaint concerning questions of Federal laws, specifically, 42 U.S.C. §2000e et seq. - Title VII of the Civil Rights Act of 1964; 42 U.S. Code § 12101 et seq. - Title I of the Americans with Disabilities Act; 18 U.S. Code §1961 et seq. – The Rackateer Influenced and Corrupt Organizations ("RICO") Act; and 18 U.S.C. § 1951 (the HOBBS Act);

   b. 28 U.S.C. §1367, which gives district courts supplemental jurisdiction over state law claims.  In this Complaint, the State law claims are violations of the Maine Human Rights Act; and

      c.  18 U.S.C. § 1964, which gives district courts subject matter jurisdiction over claims arising from 18 U.S. Code §1961 et seq. – The Rackateer Influenced and Corrupt Organizations ("RICO").

3) Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2) because:

      a.  Defendants Ryan Reardon, Marsha Alexander, Calista Campbell, Laura Briggs, Jessica Quinn and Dennis Cyr are subject to personal jurisdiction in this judicial district and each of the Defendants reside in this district;

      b.  The Kennebec County Sheriff's Office and its Corrections Division are located wholly within this district; and

      c.  The events that give rise to this Complaint occurred in this district.

## PARTIES

4) Plaintiff Diedre DiGiacomo is a natural person, a citizen of the United States and resides in the County of Kennebec, State of Maine, which is in this judicial district. Plaintiff DiGiacomo was employed as a Corrections Officer with the Kennebec County Sheriff's Office, Corrections Division from November 4, 2013 to May 2015.

5) Plaintiff Deborah Huard is a natural person, a citizen of the United States and resides in the County of Kennebec, State of Maine, which is in this judicial district. Plaintiff Huard was employed as, inter alia, a Corrections Officer with the Kennebec County Sheriff's Office, Corrections Division at the time of her forced retirement from 1989 to June 30, 2015.

6) Plaintiff Cheri Caudill is a natural person, a citizen of the United States and resides in the County of Kennebec, State of Maine, which is in this judicial district. Plaintiff Caudill

employed as a Clerical Specialist and Corrections Officer with the Kennebec County Sheriff's Office, Corrections Division at the time of her wrongful termination from March 18, 2013 to September 17, 2014.

7) Defendant Kennebec County Sheriff's Office is a department within the County of Kennebec which operates the Kennebec County Correctional Facility and has a principal office located at 125 State Street, Town of Augusta, County of Kennebec, State of Maine 04330.  Defendant Kennebec County Sheriff's Office (hereinafter "KCSO") is a duly organized entity of local government under Maine law and Kennebec County code or ordinance.

8) Defendant Kennebec County Correctional Facility (hereinafter "KCCF") is part of the Corrections Division of the County of Kennebec which is operated by the KCSO and has a principal location of 115 State Street, Town of Augusta, County of Kennebec, State of Maine 04330 and is a duly organized entity of local government under Maine law and Kennebec County code or ordinance.

9) Defendant Ryan P. Reardon is the interim-Sheriff for the KCSO and a resident of Oakland, Maine, County of Kennebec. At all times pertinent to this action, he was a supervisor and/or high-ranking official at KCSO with management authority over the Plaintiffs and the Defendants.  He is being sued in both his official and individual capacities.

10) Defendant Captain Marsha J. Alexander is the Corrections Administrator for KCSO and is a resident of Oakland, Maine, County of Kennebec.   At all times pertinent to this action, she was a supervisor and/or high-ranking official at KCSO with management

authority over the Plaintiffs.   She is being sued in both her official and individual capacities.

11) Defendant Calista Campbell is a Lieutenant for KCSO and is a resident of Maine, town unknown to Plaintiffs at this time. It is the Plaintiffs' belief that she resides in Kennebec County.   At all times pertinent to this action, she was a supervisor and/or high-ranking official at KCSO with management authority over the Plaintiffs DiGiacomo and Caudill and, in pertinent part, over Plaintiff Huard.  She is being sued in both her official and individual capacities.

12) Defendant Laura Briggs is a Staff Sergeant for KCSO and is a resident of Hallowell, Maine, County of Kennebec.   At all times pertinent to this action, she was a supervisor and/or high-ranking official at KCSO with management authority over the Plaintiffs DiGiacomo and Caudill and, in pertinent part, over Plaintiff Huard.  She is being sued in both her official and individual capacities.

13) Defendant Jessica Quinn is an employee with KCSO whose title is unknown to Plaintiffs at this time.  She is a resident of Maine, town unknown to Plaintiffs at this time.  It is the Plaintiffs' belief that she resides in Kennebec County.   She is being sued in both her official and individual capacities.

14) Defendant Dennis Cyr is a Sergeant for KCSO and is a resident of Maine, town unknown to Plaintiffs at this time.  It is the Plaintiffs' belief that he resides in Kennebec County. At all times pertinent to this action, he was a supervisor and/or high-ranking official at KCSO with management authority over the Plaintiffs DiGiacomo and Caudill and, in pertinent part, over Plaintiff Huard.  He is being sued in both his official and individual capacities.

15) Defendant Terry York is the Human Resource Manager for the Kennebec County Sheriff's Office and the Kennebec County Sheriff's Office, Corrections Division. She is a resident of Maine, town unknown to Plaintiffs at this time. It is the Plaintiffs' belief that she resides in Kennebec County. She is being sued in both her official and individual capacities.

16) Defendant State of Maine Department of Corrections (hereinafter "MDOC") is a duly organized entity of State government under Maine law and State code or ordinance with a principal location of 25 Tyson Drive 3rd Floor, State House Station 111, Augusta, Maine 04333-0111.

## JURY TRIAL DEMAND

17) Pursuant to Fed.R.Civ.P. 38(b)(2) and Fed.R.Civ.P. 5(d), Plaintiff hereby demands a trial by jury on all issues triable to a jury.

## INTRODUCTION

18) This is a civil action for violations of the Maine Human Rights Act and Title VII of the Civil Rights Act of 1964 in that the Defendants did discriminate unlawfully against the Plaintiffs based on gender, sexual orientation, religion and physical disability. The Maine Human Rights Act and Title VII of the Civil Rights Act of 1964 address the types of discriminatory practices that are forbidden in the workplace. In the present case higher ranking officials of the Kennebec County Sheriff's Office and the Kennebec County Sheriff's Office, Corrections Division (aka the Kennebec County Correctional Facility) are in fact routinely discriminating against female Corrections Officers and lesbian Corrections Officers. The higher ranking officials named in this Complaint who are responsible for the investigation and disciplinary action against offenders routinely

endorse the hazing, pranking, and third party offending of these Corrections Officers by failing to investigate complaints and by blaming the victims of such harassment.  Each of the Plaintiffs have been subjected to unlawful discrimination and forcibly terminated from employment based on their protected status.

19) This is also a civil action for violations of 18 U.S.C. § 1961 *et seq*. (Racketeer Influenced And Corrupt Organizations Act or RICO). RICO addresses the corrupt abuse and misuse – usually covertly – of organizations, entities, businesses, institutions or even governments or government agencies, such that superficially legitimate entities actually operate for criminal purposes irrelevant to the entity's purpose. In the present case higher ranking officials of the Kennebec County Correctional Facility and Kennebec County Sheriff's Office are in fact corruptly engaged in a pattern of racketeering by having committed multiple acts of racketeering activity in violation of 18 U.S.C. §1961(5).  The racketeering activity consists of criminal activity such as theft by extortion in violation of 17-A M.R.S.A. §355; multiple counts of aggravated forgery in violation of 17-A M.R.S.A. §702(1)(D); multiple counts of unlawful employment discrimination in violation of 5 M.R.S.A. §4551, et sec; abuse of their power in violation of 17-A M.R.S.A. §601, et sec. (bribery and corruption) by advancing themselves to higher ranking, higher paying positions (regardless of their qualifications or lack thereof) and advancing certain favored staff personnel, regardless of their qualification or lack thereof, who have engaged in acts of sexual harassment and discrimination to create a hostile work environment to the detriment of employees targeted for termination.  This association-in-fact enterprise has falsified official statements and coerced official statements with the intent to defraud or deceive other agencies such as the Maine Department of Corrections,

Office of Professional Responsibility and the Maine Human Rights Commission. This constitutes the misuse of the federal funding and government offices to advance favored, oftentimes related, personnel rather than proper official purposes which violates RICO but is also an injury to, and corruption of, the legitimacy of the Kennebec County Sheriff's Office and the Kennebec County Correctional Facility. That is, RICO contemplates injury to the corrupted organization itself by being abused, as well as to others in the process.

### FACTS SPECIFIC TO PLAINTIFF HUARD

20) Plaintiff Deborah Huard (hereinafter referred to as "Huard") was employed as a Staff Sergeant from approximately 1994 to October 10, 2012 and as a Corrections Officer from December 10, 2012 to June 30, 2015 at the Kennebec County Correctional Facility ("KCCF").

21) Huard engaged in gainful employment with KCCF for a total tenure of over 25 years.

22) Huard spent 18 years serving KCCF as Staff Sergeant.

23) During her tenure as Staff Sergeant, Huard received many positive performance evaluations and commendations. In fact, during her 25 ½ years of service to KCCF, Huard was regarded as a highly valued member of the department of corrections.

24) On October 10, 2012, Huard was wrongfully terminated from her position as Staff Sergeant so that Defendant Calista Campbell could be promoted from Clerical Specialist (Mail Clerk) to Staff Sergeant. Defendant Calista Campbell did not possess all the requirements of the position in that she was not Corrections Officer certified. The job requirements posting was altered to remove that requirement after Calista Campbell was given the position.

25) Plaintiff Huard was wrongfully terminated for allegedly lying to a superior regarding an open investigation of two Officers. At issue was two statements she made to Chief Deputy Everett Flannery. After having been asked if she questioned one particular officer on two occasions, Plaintiff Huard first stated that she "forgot" and then when asked again, she stated she "didn't know" why she didn't. This was deemed a "lie" and for this, Plaintiff Huard was terminated.

26) Other male officers and supervisors have committed more egregious acts but were not terminated. For example, in August of 2015, Corporal McLean was seen and caught having sexual relations with a subordinate in the KCCF parking lot by Sergeant LaChance. For this infraction, Corporal McLean was not fired but instead was offered a deal to either give up his rank and retain seniority or have his rank taken and lost seniority. Corporal McLean opted to retain his seniority and give up his rank.

27) Subsequently, after appeal of her termination, Huard was rehired but not permitted to hold her Staff Sergeant position. She was demoted to Corrections Officer.

28) The duties performed by Plaintiff Huard when she was a Staff Sergeant were subsequently assigned to three other staff members, including Defendant Quinn.

29) In 2012, Huard developed a physical disability related to foot surgeries which did not adversely affect her ability to perform her job, however, her doctor restricted her to no overtime. She was otherwise fit to perform all aspects of her job and duties therein.

30) From December 13, 2012 to February 25, 2015, KCCF accommodated this request without complaint of undue hardship. Huard provided timely orders from her doctor and, upon request, the County preferred provider, Concentra which KCCF required she be evaluated by.

31) For over three years, Plaintiff Huard was not mandated to perform overtime hours.

32) On June 11, 2014, Jason Chretian, P.A. from Concentra wrote a doctor's order restricting Huard to no overtime and stated in his order that he would re-evaluate in one year. Dr. Chretien declared Huard otherwise fit for duty in all aspects.

33) Despite the fact that one year had not yet lapsed, Terry York, Human Resource Manager at KCCF, demanded that Huard be re-evaluated in February 2015.

34) On February 25, 2015, only 8 months after her prior evaluation, Terry York requested a re-evaluation of Plaintiff Huard's ability to work overtime. Terry York specifically requested that special attention be paid to Plaintiff Huard's feet and whether or not she could work greater than 40 hours (overtime).

35) Concentra physician assistant Jason Chretien, PA-C, after evaluating and examining Officer Huard, specifically paying special attention to her feet and whether or not she was able to work greater than 40 hours, determined that due to her foot pain and foot issues, he was putting her on "permanent restriction" of "no OT."

36) Despite having paid special attention to Plaintiff Huard's feet and whether or not she could work overtime and determining that while she was otherwise fit for duty but could not work overtime, Terry York again contacted Concentra for a revision in the doctor's order.

37) Subsequent to pressure from Kennebec County Correctional Facility, Jason Chretien, PA-C changed his order to accommodate Terry York's influence.

38) In her effort to combat this obvious undue influence her employer placed on the county's preferred provider who initially ordered a permanent no overtime restriction and then, without re-evaluating Officer Huard, changed their mind about her ability to perform

overtime after discussions with Terry York, Officer Huard sought independent medical opinions.  On February 27, 2015 Danielle Doyon, PA-C recommended no overtime.  On March 21, 2015 James Wilson, DPM recommended no overtime additional duty.  On April 7, 2015 Danielle Doyon, PA-C again requested Officer Huard only work 41.25 hours until her appointment with her specialists who recommended no overtime due to her cavovarus foot deformity, numbness, tingling, and idiopathic neuropathy.  On May 13, 2015 Richard T. Samson, DPM examined Officer Huard and restricted her to no overtime due to chronic foot pain.

39) Each of these physicians are actively practicing medicine and took the time to meet with and evaluate Plaintiff Huard's medical conditions.  Two of these physicians are Doctors of Podiatric Medicine (DPM).

40) Dr. Steve Brewster, Area Medical Director for Concentra Occupational Medicine Centers in Maine performed a "limited review of Ms. Huard's medical records, had communication with her PCP, and a discussion with her podiatrist, Dr. Michael Kipp" to determine "there is no medical contraindication for Ms. Huard to work overtime, as long as [Kennebec County Sheriff's Department is] able to accommodate ongoing work limitations…as long as it enables her to sit for greater than 50% of that overtime."

41) Dr. Brewster did not ever personally examine Plaintiff Huard.  Never does Dr. Brewster have any communication directly with Plaintiff Huard.

42) Despite having extreme pain in her feet after standing for excessive periods of time, Plaintiff Huard is forced to do mandatory overtime.

43) Plaintiff Huard was offered to perform her overtime hours in the control room where she was able to sit, however, this was not a reasonable accommodation since the cold air in

the room and sitting for extended periods of time adversely affected her physical disability.

44) Finally, on April 13, 2015, Officer Huard met with then-Sheriff Randall A. Liberty. She reiterated to her senior-most superior that working overtime is causing her extreme pain in her feet and that she is unable to work the extra hours without severe consequence. Sheriff Liberty's response is that he would permit a reduction in her overtime hours to 4 if she provided a firm resignation/retirement date. As Officer Huard appealed for help to the highest authority in her organization, he "recognizes her seniority and supports an honorable transition as long as she provides a firm retirement/resignation date."

45) Plaintiff Huard's only restriction was no overtime. In all other aspects, she was physically capable of performing all essential functions of her job. Each doctor she saw who ordered no overtime declared her fit for duty, including Jason Chretien of Concentra.

46) Shortly after Plaintiff Huard was forced to retire, Corrections Officers received a substantial pay raise after the new Union Contract was instated.

### CLAIMS SPECIFIC TO DEBORAH HUARD

### CLAIM I
### Discrimination based on physical disability in violation of 5 M.R.S.A. §4551 et seq. – Maine Human Rights Act and 42 U.S. Code § 12101 et seq. - Title I of the Americans with Disabilities Act of 1990.

47) Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

48) The Kennebec County Sheriff's Office and The Kennebec County Sheriff's Office, Corrections Division are each a "covered entity" as defined by 5 M.R.S.A. §4553(1-B) in that each is a public entity.

49) 5 M.R.S.A. §4572 makes is unlawful for a covered entity to discriminate against a person with a disability because of their disability in regard to the terms, conditions and privileges of employment.

50) The Kennebec County Sheriff's Office and The Kennebec County Sheriff's Office, Corrections Division is a "covered entity" as defined by 42 U.S. Code § 12111(2) in that they are employers.

51) 42 U.S. Code § 12112 makes is unlawful for a covered entity to discriminate against a person with a disability because of their disability in regard to the terms, conditions and privileges of employment.

52) Plaintiff Huard has a disability as defined by 5 M.R.S.A. §4553-A(1)(A)(1).  She has been diagnosed with Neuroma in both feet which substantially limits one or more of her major life activities.

53) As defined by the American Podiatric Medical Association, "[a] neuroma is a painful condition, also referred to as a "pinched nerve" or a nerve tumor. It is a benign growth of nerve tissue frequently found between the third and fourth toes. It brings on pain, a burning sensation, tingling, or numbness between the toes and in the ball of the foot."

54) Plaintiff Huard has a disability as defined by 42 U.S. Code § 12102 in that she has a physical impairment, diagnosed by her doctor, for which her employer could have made reasonable accommodation by following her doctor's order of no overtime.

55) Plaintiff Huard's disability causes her to experience pain in her feet after extended periods of standing.  However, these symptoms did not impact her ability to perform the essential functions of her job as a Corrections Officer.

56) Plaintiff Huard is otherwise qualified with reasonable accommodations to perform the essential functions of her job as a Corrections Officer.

57) From December 13, 2012 until February 25, 2015, Plaintiff Huard was permitted by her employer to work her regularly scheduled hours with no overtime due to this very same condition.

58) The Kennebec County Sheriff's Office and The Kennebec County Sheriff's Office, Corrections Division adversely treated Plaintiff Huard based in whole or in part on her disability.  Plaintiff Huard had several doctors orders restricting her from overtime. Despite having these doctor orders, Plaintiff Huard was ordered by her employer to perform mandatory overtime.

59) The Kennebec County Sheriff's Office and The Kennebec County Sheriff's Office, Corrections Division adversely treated Plaintiff Huard based in whole or in part on her disability by forcing her to retire prematurely.

60) The Kennebec County Sheriff's Office and The Kennebec County Sheriff's Office, Corrections Division engaged in a discriminatory practice with reckless indifference to the rights of Plaintiff Huard who is protected under the Maine Human Rights Act.

61) As Human Resource Manager, Defendant Terry York knew or should have known that Plaintiff Huard was in a protected class having a physical disability yet Defendant York intentionally exerted coercion on the Concentra doctor to alter his orders for Plaintiff Huard without re-evaluation, based on Defendant York's instruction.

62) As a proximate result of the Defendants' discriminatory actions, Plaintiff Huard has suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

63) As a result of those actions and consequent harms, Plaintiff Huard has suffered such damages in an amount to be proved at trial.

64) Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff Huard's rights.

65) Plaintiff Huard requests relief as described in the Prayer for Relief below.

### CLAIM II
### Unlawful Retaliation in violation of 5 M.R.S.A. §4551 et seq. – Maine Human Rights Act and 42 U.S.C. §2000e et seq. - Title VII of the Civil Rights Act of.

66) Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

67) 5 M.R.S.A. §4633(2) makes unlawful for Kennebec County Sheriff's Office and the Kennebec County Correctional Facility to "coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of the rights granted or protected by [the Maine Human Rights] Act…"

68) 5 M.R.S.A. §4633(1) makes unlawful for Kennebec County Sheriff's Office and the Kennebec County Correctional Facility to "discriminate against any individual because that individual has opposed any act or practice that is unlawful under [the Maine Human Rights] Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [the Maine Human Rights] Act.

69) 42 U.S. Code § 2000e–3(a) makes unlawful for Kennebec County Sheriff's Office and the Kennebec County Correctional Facility to "discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by [the Equal Employment Opportunity Act], or because he has made a charge…under this [the Equal Employment Opportunity Act]."

70) Plaintiff Huard is a citizen of State of Maine who has a civil right to secure employment without discrimination because of her physical disability pursuant to 5 M.R.S.A. §4571.

71) The Union Contract expired on June 30, 2014 and a new contract was being negotiated. As Union Shop Steward, Plaintiff Huard was involved in the negotiations on behalf of Officers and advocating for Officer rights (for safety, breaks, etc.).

72) As Union Shop Steward Plaintiff Huard advocated for safer working conditions in that I made demands for: (1) proper gear/suits for Officers who handle biohazardous waste and/or materials; and (2) sufficient breaks for Officers during long shifts.

73) Plaintiff Huard also complained that the excessive mandatory overtime was detrimental to Officer safety, that the number of Officers to inmate ratio on the floors was unsafe. Plaintiff Huard also refused to do the Triple "S" job that is designated for supervisors only for Defendant Sergeant Cyr who notoriously demanded that Officers do his responsibilities.

74) Officer safety conditions did not improve in that excessive mandatory overtime still existed at the time of my departure, breaks were not consistently given to officers in timely manner and certain male Sergeants had male officers perform their duties during shifts for special favors such as early release from shifts.

75) During this time, Jason Chretien, a doctor at the County preferred Concentra, supplied a medical note exempting Plaintiff Huard from overtime hours.

76) Defendant York, the Human Resources Manager, called Concentra, and demanded that the doctor who ordered no overtime change the medical note to remove the "no overtime" order.  Terry York told Dr. Chretien to make this change because she said it was against the Union Contract to order no overtime.

77) The medical note was changed and the order of no overtime was changed. Plaintiff Huard was forced to work overtime despite the condition of her feet. This occurred in the same timeframe that she was objecting to the harassment and work place hostility that Plaintiff DiGiacomo was facing and complaining of hazardous and unsafe/dangerous workplace conditions Corrections Officer faced.

78) Plaintiff Huard tried to appeal this decision over several months but it was made clear to that if she did not do overtime, she would be found not competent or unfit for duty and that she would lose her job, despite having been declared fit for duty by multiple doctors.

79) In violation of 42 U.S. Code § 2000e–3(a) and 5 M.R.S.A. §4633(2), the Kennebec County Sheriff's Office and the Kennebec County Correctional Facility did coerce, threaten, intimidate and interfere with Plaintiff Huard's rights under the Maine Human Rights Act by its constructive discharge by forcing her into premature retirement.

80) In violation of 42 U.S. Code § 2000e–3(a) and 5 M.R.S.A. §4633(1), the Kennebec County Sheriff's Office and the Kennebec County Correctional Facility did discriminate against Plaintiff Huard because she opposed the discrimination against her by her supervisors who refused to abide by her doctors' orders of no overtime.

81) As a proximate result of the Defendants' discriminatory actions, Plaintiff Huard has suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

82) As a result of those actions and consequent harms, Plaintiff Huard has suffered such damages in an amount to be proved at trial.

83) Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff Huard's rights.

84) Plaintiff Huard requests relief as described in the Prayer for Relief below.

## CLAIM III
## Unlawful Retaliation in violation of 26 M.R.S.A. §833(1)(A) – Whistleblowers Protection Act

85) Plaintiff Huard made legally protected whistleblower reports in that she complained of unsafe working conditions as Union Shop Stewart on behalf of the Corrections Officers.

86) Subsequent to her numerous reports, including written reports to high ranking administrative personnel, including the named Defendants, work conditions remained unsafe.

87) Contemporaneous with Plaintiff Huard's complaints of unsafe working conditions, her employer began forcing her into overtime, despite the pain it caused her.

88) Plaintiff Huard's legally protected whistleblower reports were a substantial motivating factor in her forced retirement/constructive discharge.

89) As a result of those actions and consequent harms, Plaintiff Huard has suffered such damages in an amount to be proved at trial.

90) Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff Huard's rights.

91) Plaintiff Huard requests relief as described in the Prayer for Relief below.

## FACTS SPECIFIC TO PLAINTIFF DIGIACOMO

92) On November 4, 2013, Plaintiff Diedre M. DiGiacomo (hereinafter referred to as "DiGiacomo") was hired as a corrections officer at the Kennebec County Correctional Facility ("KCCF").

93) DiGiacomo engaged in gainful employment with KCCF for a tenure of 18 months.

94) During her tenure as Corrections Officer, DiGiacomo received many positive performance evaluations and commendations.

95) From her first day on the job, Plaintiff DiGiacomo was subjected to daily sexual harassment, discrimination based on her gender, religion, and sexual orientation, bullying, and a hostile work environment.

96) On January 29, 2014, Plaintiff DiGiacomo complained of comments made by Officer Roque to Sergeant LaChance, her direct supervisor.

97) Officer Roque made such comments to Plaintiff DiGiacomo as "the only thing that should make me hard in the shower is you" when they were performing work duties in the showering unit of the facility.

98) At no time did Sergeant LaChance investigate Plaintiff DiGiacomo's complaint about Officer Roque's offensive comments.

99) By March 6, 2014, after having complained of sexual harassment and discriminatory remarks made by fellow Officer Roque for two months, no investigation ensued nor did any higher ranking official reprimand Officer Roque.

100)   Sergeant LaChance, instead, advised Plaintiff DiGiacomo to, "take care of an issue now (if there is one) or [let] it go.  She cannot hold items over peoples heads" which he documents in his personal notes.

101)   Other officers such as Officer Cipriano, Officer Underwood, and others made frequent discriminatory and harassing comments to Plaintiff DiGiacomo on a consistent basis for which she continued to complain.

102)     On June 22, 2014, Plaintiff DiGiacomo was overmedicated by the medical staff at

KCCF.   After having been dispensed Benadryl and another medication during her

scheduled shift by the medical personnel for a rash, Plaintiff DiGIacomo could not

adequately perform her duties.  Despite having called for help to her supervisor, Corporal

Gardner, she was not relieved of duty which posed grave risk to her life and safety.  She

was ordered to remain on duty an additional 8 hours, which she refused.  As a result of

this refusal of an "order in" to work additional hours, DiGiacomo received disciplinary

action in the form of a "write up" which she appealed.

103)     On July 23, 2014, DiGiacomo had her first meeting with Defendant Calista

Campbell who then was her Lieutenant at KCCF.   The meeting was to discuss her

disciplinary action after having refused an "order in".  During this meeting, DiGiacomo

informed Defendant Campbell that she was the subject to certain sexual harassment by

male Corrections Officers.  In particular, DiGiacomo reported that Officer Underwood,

an African American Corrections Officer, stated to her that "if you had a dark sexy piece

of chocolate like me, you wouldn't be a lesbian."

104)     At no time did Lieutenant Calista Campbell initiate an investigation based on

Plaintiff DiGiacomo's complaints of discrimination and sexual harassment.   Plaintiff

DiGiacomo had three separate meetings with Defendant Campbell to advise her

Lieutenant that she was the victim of discrimination and sexual harassment.

105)     Despite repeated and consistent complaints to her supervisors, including

Defendant Dennis Cyr, no investigation was initiated based on the daily sexual

harassment and discrimination of Plaintiff DiGiacomo.

106)    During her employment with KCCF, DiGiacomo was subjected to bullying by her co-workers and supervisors, constant startling due to her startle reflex, sexual harassment, discrimination based on her religion, gender and sexual orientation, and work place harassment.

107)    Despite having reported these instances to her supervisors, at no time did any higher ranking KCCF official investigate the complaints of DiGiacomo.

108)    In fact, DiGiacomo's superiors, including Defendant Cyr, often told her that she was to blame for poor relationships with her co-workers and that she was "difficult to get along with."

109)    During her tenure at KCCF, Plaintiff DiGiacomo took the test for promotion to Corporal.  Of the three applicants for the position of Corporal at the time Plaintiff DiGiacomo pursued a promotion, two of whom were male, she was the most qualified applicant.  One male applicant was disqualified because he did not meet the requisite time working as a Corrections Officer at the jail and the other scored lower than Plaintiff DiGiacomo.

110)    Despite being the most qualified applicant who applied for the position, she was denied the promotion which was given to a male Officer that did not submit an application for the position, take the supervisor exam or have oral boards as Plaintiff DiGiacomo did.

### CLAIMS SPECIFIC TO DIEDRE M. DiGIACOMO

### CLAIM IV
### Discrimination based on Religion and Sexual Orientation and Religion in violation of 5 M.R.S.A. §4551 et seq. – Maine Human Rights Act and 42 U.S.C. §2000e et seq. - Title VII of the Civil Rights Act of 1964.

111)     Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

112)     Plaintiff DiGiacomo is a citizen of State of Maine who has a civil right to secure employment without discrimination because of her religion and sexual orientation pursuant to 5 M.R.S.A. §4571.

113)     Plaintiff DiGiacomo was in a protected status on two counts, that is she is a lesbian whose religion is Jewish.

114)     Plaintiff DiGiacomo experienced adverse action in that she was the target of anti-lesbian and anti-Jewish discrimination by her co-workers which she reported to her superiors from January 2014 through May 2015.  Her complaints were ignored.  Plaintiff DiGiacomo was eventually constructively discharged when the retaliation against her for making complaints escalated.

115)     The anti-Semitic comments made in Plaintiff DiGiacomo's presence included such comments as, "What did Hitler say when he walked through Auschwitz?  Get off me Jew."  The speaker of this comment made a motion as though he were wiping ashes off of his lapel.  Another comment was made by Officer Jon Roque who stated, when he could not find items in the supply closet, "What is this place, Auschwitz?"  A third party bystander (not a high ranking official) told Officer Roque that this comment was not appropriate.

116)     The anti-lesbian comments included references to male genitalia including such comments as Officer Underwood stated, "If you had a sexy big piece of chocolate like mine, you wouldn't be a lesbian" and from Officer Jon Roque, "The only thing that should make me hard in the shower is you."  Officer Roque also interrogated Plaintiff

22

DiGiacomo as to whether or not she played softball and when she denied that she did, he stated, "Don't all lesbians play softball?" in a mocking and demeaning manner.

117)     Despite having reported the discriminatory acts to her superiors, no investigation ensued, nor were any offenders reprimanded.

118)     Despite having reported the discriminatory acts to her supervisors, the offenders were rewarded with promotions and pay raises.

119)     Officer Roque, who was a frequent offender, was promoted to Corporal. The aunt of his fiancé and mother of his child, Sergeant St. Pierre, was on the board to determine whether or not he received the promotion.

120)     Plaintiff DiGiacomo was denied a promotion to Corporal when she was the only qualified person who applied for the position. She was refused the position because she is female, a lesbian and Jewish and therefore, her protected status was the cause or motivating factor for this adverse action. A male officer who did not apply for the position or take the required exam and oral boards was promoted instead for this position.

121)     Plaintiff DiGiacomo was injured by the pranks of other Officers when she fell down stairs after being jump-scared and startled by a co-worker. In response to this incident, Corporal McLane made an announcement over the loudspeaker after a briefing which was derogatory in nature and referenced Plaintiff DiGiacomo's fall.

122)     Plaintiff DiGiacomo was threatened by inmates who were told by Officers that she was a "rat" because she reported Officers who were engaged in pranks such as licking contests, putting toothpaste on rags to imitate semen, and placing a "soiled" diaper in the elevator to haze an Officer who defecated in his pants.

123)    Defendant York knew or should have known that the existing sexual harassment and discrimination training for Officers was insufficient based on the repeated complaints of Plaintiff DiGiacomo.   Yet Defendant York failed or otherwise refused to conduct proper training.

124)    Defendants' conduct as herein alleged violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), which makes unlawful discrimination against employees on the basis of religion. The term "religion" includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

125)    Defendants discriminated against Plaintiff DiGiacomo in violation of Title VII when they refused or otherwise failed to investigate her complaints of discrimination but instead rewarded the most egregious offenders with promotions and pay raises.

126)    Defendants discriminated against Plaintiff DiGiacomo in violation of Title VII when they failed to investigate her complaints of discrimination and failed to promote her for position of Corporal although she was the only qualified candidate for the position.

127)    As a proximate result of the Defendants' discriminatory actions, Plaintiff DiGiacomo has suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

128)    As a result of those actions and consequent harms, Plaintiff DiGiacomo has suffered such damages in an amount to be proved at trial.

129)    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff DiGiacomo's rights.

130)    Plaintiff DiGiacomo requests relief as described in the Prayer for Relief below.

## CLAIM V
### Unlawful Retaliation in violation of 5 M.R.S.A. §4551 et seq. – Maine Human Rights Act and 42 U.S.C. §2000e et seq. - Title VII of the Civil Rights Act of 1964.

131)     Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

132)     5 M.R.S.A. §4633(2) makes unlawful for Kennebec County Sheriff's Office and the Kennebec County Correctional Facility to "coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of the rights granted or protected by [the Maine Human Rights] Act or because that individual has exercised or enjoyed…"

133)     5 M.R.S.A. §4633(1) makes unlawful for Kennebec County Sheriff's Office and the Kennebec County Correctional Facility to "discriminate against any individual because that individual has opposed any act or practice that is unlawful under [the Maine Human Rights] Act or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [the Maine Human Rights] Act.

134)     Plaintiff DiGiacomo is a citizen of State of Maine who has a civil right to secure employment without discrimination because of her religion and sexual orientation pursuant to 5 M.R.S.A. §4571.

135)     In violation of 5 M.R.S.A. §4633(2), the Kennebec County Sheriff's Office and the Kennebec County Correctional Facility did coerce, threaten, intimidate and interfere with Plaintiff DiGiacomo's rights under the Maine Human Rights Act by its failure to investigate and/or reprimand those co-workers who were known to have made discriminatory and harassing comments to Plaintiff DiGiacomo at work, by blaming

Plaintiff DiGiacomo for the offensive and discriminatory comments made by others and by constructively discharging her.

136)     In violation of 5 M.R.S.A. §4633(1), the Kennebec County Sheriff's Office and the Kennebec County Correctional Facility did discriminate against Plaintiff DiGiacomo because she opposed the discrimination against her by her co-workers by the failure of her employers to give her a promotion based on her sexual orientation, religion and gender when she was the only qualified applicant for the position.

137)     42 U.S. Code § 2000e–3(a) makes unlawful for Kennebec County Sheriff's Office and the Kennebec County Correctional Facility to "discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by [the Equal Employment Opportunity Act], or because he has made a charge…under this [the Equal Employment Opportunity Act]."

138)     In March of 2015, Plaintiff DiGiacomo wrote a lengthy letter to Defendant Campbell itemizing all the discriminatory and harassing acts perpetrated against her.  She provided names of the offenders and gave great detail of the discrimination she faced on a daily basis.

139)     Defendant Campbell refused or otherwise failed to investigate Plaintiff DiGiacomo's complaints.

140)     Subsequent to her written complaint, the Defendants and other personnel at KCCF, including Plaintiff DiGiacomo's supervisors, engaged in a concerted effort to retaliate against her by making false claims that she was discriminatory and harassing to other co-workers.

141)     In May of 2015, Plaintiff DiGiacomo requested assurance that the discrimination and retaliation would cease.  With no assurance, no investigation of her complaints and no support from her superiors, Plaintiff DiGiacomo had no alternative but to consider herself constructively discharged from her position.

142)     Plaintiff DiGiacomo bases her claim of unlawful retaliation on her series of complaints of discrimination and harassment spanning a 18 month period which escalated in its urgency.  After providing written notice to her superior, Defendant Campbell, the retaliation became increasingly worse to the point where she was threatened by inmates who believed her to be a "rat."  Immediately thereafter, Plaintiff DiGiacomo was constructively terminated.  The temporal proximity of Plaintiff DiGiacomo's written complaint to the retaliatory action against her provides a causal link for purposes of a prima facie case of unlawful retaliation.

143)     As a proximate result of the Defendants' discriminatory actions, Plaintiff DiGiacomo has suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

144)     As a result of those actions and consequent harms, Plaintiff DiGiacomo has suffered such damages in an amount to be proved at trial.

145)     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff DiGiacomo's rights.

146)     Plaintiff DiGiacomo requests relief as described in the Prayer for Relief below.

### CLAIM VI
### Unlawful Retaliation in violation of 26 M.R.S.A. §833(1)(A) – Whistleblowers Protection Act

147)     Plaintiff DiGiacomo made legally protected whistleblower reports in that she complained on numerous occasions in person and in writing to her superiors that she was the victim of sexual harassment, bullying and discrimination in the workplace by co-workers.

148)     Subsequent to her numerous reports, including written reports to Defendant Lieutenant Campbell, the hazing, sexual harassment and discrimination not only continued, but escalated.

149)     No higher ranking personnel, superiors to Plaintiff DiGiacomo, would investigate and/or eliminate the bullying, sexual harassment and discrimination.

150)     Plaintiff DiGiacomo was constructively discharged when she informed her employer that she would return to work if they could provide assurances that the bullying, harassment and discrimination would cease.

151)     No assurance was forthcoming.  To date, no offender has been reprimanded for the abuse inflicted upon Plaintiff DiGiacomo.

152)     Plaintiff DiGiacomo's legally protected whistleblower reports were a substantial motivating factor in her constructive discharge.

153)     As a proximate result of the Defendants' discriminatory actions, Plaintiff DiGiacomo has suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

154)     As a result of those actions and consequent harms, Plaintiff DiGiacomo has suffered such damages in an amount to be proved at trial.

155)     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff DiGiacomo's rights.

156)     Plaintiff DiGiacomo requests relief as described in the Prayer for Relief below.

### FACTS SPECIFIC TO PLAINTIFF CAUDILL

157)     On March 18, 2013, Plaintiff Cheri Caudill was hired as a Clerical Specialist at the Kennebec County Correctional Facility ("KCCF").

158)     From the date of her hire to when she entered the Academy for Corrections Officer certification in November of 2014, Plaintiff Caudill was favored by the higher ranking administrators and co-workers at KCCF.

159)     Plaintiff Caudill was invited to eat lunch with her co-workers, including Defendant Jessica Quinn.

160)     Plaintiff Caudill had many conversations with Defendant Quinn who espoused anti-gay rhetoric.

161)     On one specific occasion, Defendant Quinn stated that a lesbian Corrections Officer and her female partner were making "gay babies."

162)     On several occasions, Defendants Briggs, Quinn and Campbell invited Plaintiff Caudill to accompany them on off-duty social gatherings and requested that they exchange cell phone numbers.

163)     On or about November 2014, Plaintiff Caudill entered the Academy for training to become Corrections Officer certified.  During her time at the Academy, it was learned that Plaintiff Caudill is a lesbian who was in a relationship with a woman.

164)     From the time that Defendant Quinn learned of Plaintiff Caudill's sexual orientation, Defendant Quinn made a concerted effort to have her terminated from employment.

165)    Defendant Quinn made accusations the Plaintiff Caudill made egregious errors in the performance of her duties without substantiation such as accusing her of breaking protocol when in fact, she did not.

166)    Defendant Quinn made baseless accusations against Plaintiff Caudill in that she reported to supervisors that Plaintiff Caudill held unopened mail in her office, that she gave an inmate a stamped envelope, that she failed to deliver legal mail to an inmate within the mandatory 24-hour period.

167)    Plaintiff Caudill was terminated without having the opportunity to defend herself against these baseless accusations as is the proper procedure at the Kennebec County Correctional Facility.

168)    Plaintiff Caudill was terminated without having the benefit of an investigation by her superiors into the baseless allegations asserted by Defendant Quinn.

169)    It is a known fact that Defendant Quinn is a personal friend of Defendant Campbell who is the Lieutenant.   Defendant Quinn bragged about babysitting the Lieutenant's children.

170)    Prior to Defendant Quinn learning that Plaintiff Caudill is gay, Plaintiff Caudill had no issues or problems at work.   She received several accolades from superiors, including then-Sheriff Liberty, for going above and beyond her duties on a consistent basis.

171)    The personal friendships amongst her superiors left no recourse for Plaintiff Caudill to address the issues and problems that developed after Defendant Quinn learned that Plaintiff Caudill is gay.  Her superiors were person friends of Defendant Quinn off-

duty and despite the fact that Plaintiff Caudill sought assistance from her supervisor, Defendant Quinn's mere accusations were sufficient to have Plaintiff Caudill terminated.

172)      Subsequent to her termination, Plaintiff Caudill applied for unemployment compensation.  After investigation, the Maine Department of Labor concluded that Plaintiff Caudill did not engage in the misconduct for which she was terminated.

173)      Subsequent to her termination, Defendant Quinn secured Plaintiff Caudill's position as mail clerk for a mutual friend of hers, Defendant Briggs and Defendant Campbell.

## CLAIMS SPECIFIC TO CHERI CAUDILL

### CLAIM VII
### Discrimination based Sexual Orientation in violation of 5 M.R.S.A. §4551 et seq. – Maine Human Rights Act

174)      Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

175)      Plaintiff Caudill is a citizen of State of Maine who has a civil right to secure employment without discrimination because of her religion and sexual orientation pursuant to 5 M.R.S.A. §4571.

176)      Plaintiff Caudill was in a protected status based on her sexual orientation since she is a lesbian.

177)      Plaintiff Caudill experienced adverse action in that she was the target of anti-lesbian discrimination by her co-workers who targeted her for termination based on her sexual orientation.

178)     As a proximate result of the Defendants' discriminatory actions, Plaintiff Caudill has suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

179)     As a result of those actions and consequent harms, Plaintiff Caudill has suffered such damages in an amount to be proved at trial.

180)     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff Caudill's rights.

181)     Plaintiff Caudill requests relief as described in the Prayer for Relief below.

### CLAIMS COMMON TO ALL PLAINTIFFS

### CLAIM VIII
### Discrimination based on gender in violation of 5 M.R.S.A. §4572 – Maine Human Rights Act and 42 U.S.C. §2000e-2(a)(2) (Title VII of the Civil Rights Act of 1964).

182)     Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

183)     Plaintiff DiGiacomo was denied a promotion to Corporal which her employer stated was based on her lack of knowledge of the "Intake" process.

184)     The Kennebec County Sheriff's Office and the Kennebec County Correctional Facility routinely deny women the ability to learn the "Intake" process.

185)     Despite having requested Intake training, Plaintiff DiGiacomo was denied Intake Training.

186)     Of the male supervisors who received promotions, most do not know the Intake process.

187)     Although female Officers are permitted to be "floaters" in Intake and do such tasks as "checks," they are not permitted to be formally trained in this department.

188)    Despite the fact that Plaintiff DiGiacomo requested formal training in intake multiple times, she was denied that request on each occasion.

189)    Plaintiff Caudill were also denied training in Intake.

190)    The refusal to train female (lesbian) Officers in Intake based on their gender is unlawful discrimination.

191)    As a proximate result of the Defendants' discriminatory actions, Plaintiffs have suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

192)    As a result of those actions and consequent harms, Plaintiffs have suffered such damages in an amount to be proved at trial.

193)    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiffs' rights.

194)    Plaintiffs request relief as described in the Prayer for Relief below.

## CLAIM IX
## HOSTILE WORK ENVIRONMENT

195)    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

196)    Each of the Plaintiffs suffered repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment.

197)    Each of the Plaintiffs suffered from consistent discrimination over an extended span of time which was humiliating, offensive and which unreasonably interfered with their ability to perform their duties.

198)     Plaintiff DiGiacomo suffered from consistent discrimination over an extended span of time which was physically threatening and by which she was injured when she fell down stairs after being jump-scared and startled as a prank by a co-worker.

199)     Plaintiff Huard had a physical disability which rendered her unable to perform overtime.  Plaintiff Huard was subjected to hostility from her employer who refused to abide by her doctor's order of "no overtime."  The refusal to abide by her doctor's order was part of a concerted effort to force Plaintiff Huard to retire.  Despite having brought multiple doctor notes from at least 4 different doctors, including the County Preferred Provider, KCCF refused to reduce Plaintiff Huard's work schedule to no overtime hours. Over the course of several months, Plaintiff Huard sought assistance from all her superiors, including then-Sheriff Randall A. Liberty who demanded that Plaintiff Huard resign by a date-certain.  Plaintiff Huard was subjected to repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment.

200)     Plaintiff DiGiacomo was subjected to hostility by her employer who refused to investigate her complaints of discrimination based on her religious beliefs, sexual orientation, and gender.  Plaintiff DiGiacomo was subjected to 17 months of abusive, offensive, and humiliating discriminatory comments from her co-workers.  Despite having complained, no investigation ensued nor were any offenders reprimanded.

201)     Plaintiff Caudill was subjected to hostility by her employer based on her sexual orientation.  Because of the nepotism and off-duty friendship between her co-worker, Defendant Quinn and Defendant Campbell, Defendant Quinn was able to continually harass Plaintiff Caudill with false allegations of misconduct which her employer failed to investigate.

202)     As a proximate result of the Defendants' discriminatory actions, Plaintiffs DiGiacomo, Huard and Caudill have suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

203)     As a result of those actions and consequent harms, Plaintiffs DiGiacomo, Huard and Caudill has suffered such damages in an amount to be proved at trial.

204)     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff DiGiacomo, Huard and Caudill's rights.

205)     Plaintiffs DiGiacomo, Huard and Caudill requests relief as described in the Prayer for Relief below.

## CLAIM X
## SEXUAL HARASSMENT

206)     Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

207)     Plaintiffs are members of a protected class in that they are female and lesbians.

208)     Plaintiffs were subjected to unwelcome sexual harassment such as:  Plaintiff Huard being licked by Officer Sean Cipriano, Plaintiff DiGiacomo being told by Officer Underwood that if she had a big piece of chocolate like him, she would not be gay and being told by Officer Jon Roque that the only thing that should make him hard in the shower was her; Plaintiff DiGiacomo being told by Officer Cipriano that he licked a lesbian.

209)     Officer Cipriano, during this licking contest, licked Plaintiff Huard on her bare arm despite the fact that she told him not to.

210)     Plaintiff Caudill was present in the office when Defendant Jessica Quinn revealed certain private and intimate details about co-workers to the mail clerks.   These

conversations included discussions about Mail Clerk Amanda Morgan whose husband told Defendant Quinn that she was boring in bed and just laid there.  She also reported that a Programs Officer, Sheralyn Freeman, who was in a relationship with another officer, would often meet with a third officer at a camp to engage in "threesome" sexual encounters.

211)    Plaintiff Caudill tried to avoid the discussions but had no choice but to overhear since Defendant Quinn would often initiate these conversations in her presence.

212)    Another event sexual in nature such was that Corporal Gardner putting a diaper soiled with a melted chocolate bar on the elevator to haze an officer for having defecated his pants when he was ill.  This was witnessed by Plaintiff DiGiacomo and Plaintiff Huard.

213)    Another event sexual in nature was that Officer Cipriano put toothpaste on a rag to simulate semen to play a prank.

214)    These unwelcome sexual harassment was based upon sex and was sufficiently severe and pervasive so as to alter the conditions of the Plaintiffs' employment and create an abusive work environment.

215)    The sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the Plaintiffs in fact did perceive it to be so

216)    Plaintiff DiGiacomo complained to her superiors Defendant Cyr, Defendant Campbell (and other supervisors not named on this Complaint) on a regular basis for 18 months of the sexual harassment and abusive work environment but her employer did not investigate or reprimand any of the perpetrators of harassment.

217) As a proximate result of the Defendants' discriminatory actions, Plaintiffs DiGiacomo, Huard and Caudill have suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

218) As a result of those actions and consequent harms, Plaintiffs DiGiacomo, Huard and Caudill has suffered such damages in an amount to be proved at trial.

219) Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff DiGiacomo, Huard and Caudill's rights.

Plaintiffs DiGiacomo, Huard and Caudill requests relief as described in the Prayer for Relief below.

## CLAIM XI
## BREACH OF CONTRACT

220) Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

221) At all times pertinent to this action, Plaintiffs were employees of the Kennebec County Sheriff's Office, Corrections Division and subject to the "Agreement Between Kennebec County and Teamsters Union Local No. 340, International Brotherhood of Teamsters Chauffeurs, Warehousement and Helpers of America for the Kennebec County Employees" dated July 1, 2011 – June 30, 2014 (hereinafter referred to as the "Union Contract").

222) Article 7, Section 2 prohibits the County from discharging or suspending an employee without just cause. Employees are entitled to "Loudermill" hearings prior to discharge or suspension and must be given written notice of the discharge or suspension. This Loudermill hearing is an "opportunity prior to the imposition of discipline, for the

affected employee…to present additional facts, excuses or explanations to management prior to the effective action."

223)　　　Article 26 mandates that the County shall not discriminate against any individual with respect to the terms or conditions of employment based on the individual's religion, sex, sexual orientation or disability.  The County affirmatively states that it will abide by the American With Disabilities Act, as amended.

224)　　　Article 32 itemizes the requirements for promotions, including the requirements for promotion to Corporal.  For the position of corporal, Plaintiff DiGiacomo met all the requirements at the time of her application.

225)　　　The Union Contract represents a written, binding agreement of the parties.

226)　　　This contract required the Defendant Kennebec County Sheriff's Office, Corrections Division to provide Plaintiff Cheri Caudill with a Loudermill hearing prior to her termination.

227)　　　This contract required the Defendant Kennebec County Sheriff's Office and the Kennebec County Sheriff's Office, Corrections Division to refrain from discriminating against its employees and abide by the American With Disabilities Act.

228)　　　This contract required the  Defendant Kennebec County Sheriff's Office and the Kennebec County Sheriff's Office, Corrections Division to promote the most qualified candidate for the position of corporal at the time Plaintiff DiGiacomo applied.

229)　　　The Plaintiffs complied with all provisions of the Union Contract.

230)　　　The Defendants failed to comply with the provisions of this contract by failing to conduct a Loudermill hearing prior to termination Plaintiff Caudill.

231)     The Defendants failed to comply with the provisions of this contract by engaging in, and endorsing discrimination against all three Plaintiffs as stated above.

232)     The Defendants failed to comply with the provisions of this contract by failing to promote Plaintiff DiGiacomo to corporal based on discriminatory policies despite the fact that she was the most qualified candidate who applied for the position.

233)     As a proximate result of the Defendants' breach of contract, Plaintiffs DiGiacomo, Huard and Caudill have suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

234)     As a result of those actions and consequent harms, Plaintiffs DiGiacomo, Huard and Caudill has suffered such damages in an amount to be proved at trial.

235)     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff DiGiacomo, Huard and Caudill's rights.

236)     Plaintiffs DiGiacomo, Huard and Caudill requests relief as described in the Prayer for Relief below.

## CLAIM XII
### Vicarious Liability/Respondeat Superior

237)     Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

238)     34-A M.R.S.A. §1201 provides the Legislative intent to create a Department of Corrections to improve the administration of correctional facilities upon "recognizing the need to firmly control all of the State's correctional and detention facilities, [and] provide for the safety of staff and clients…"

239)     34-A M.R.S.A. §1202 establishes "a Department of Corrections to be responsible for the direction and general administrative supervision, guidance and planning of adult and juvenile correctional facilities and programs within the State."

240)     34-A M.R.S.A. §1208 charges the Commissioner of the Department of Corrections with setting the standards, both mandatory and desirable standards, for county and municipal detention facilities; "setting forth requirements for maintaining safe, healthful and secure facilities."

241)     34-A M.R.S.A. §1208-B(1)(A) mandates that the commissioner establish mandatory standards, policies and procedures for jails which must address jail staffing.

242)     Pursuant to 34-A M.R.S.A. §1208(2), the Commissioner is required to conduct inspections of county facilities but may also conduct inspections at any time, with or without notice, to determine compliance with standards.

243)     The Kennebec County Sheriff's Office and the Kennebec County Sheriff's Office, Corrections Division fall within the scope of the Maine Department of Corrections authority and oversight by virtue of legislative action.

244)     Despite being under the authority and oversight of the Maine Department of Corrections, the Defendants have had no significant oversight regarding the discrimination endured by certain employees.

245)     The Maine Department of Corrections Commissioner, in dereliction of his duties, has failed or otherwise refused to firmly control all the of State's correctional facilities by allowing the Defendants to engage in discriminatory practices, criminal activity, and nepotism all to the detriment of Plaintiffs.

246) As a proximate result of the Defendants Commissioner Dr. Joseph Fitzpatrick's dereliction of duty, Plaintiffs DiGiacomo, Huard and Caudill have suffered losses in compensation, earning capacity, humiliation, mental anguish and emotional distress.

247) As a result of those actions and consequent harms, Plaintiffs DiGiacomo, Huard and Caudill has suffered such damages in an amount to be proved at trial.

248) Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff DiGiacomo, Huard and Caudill's rights.

249) Plaintiffs DiGiacomo, Huard and Caudill requests relief as described in the Prayer for Relief below.

## RICO CLAIMS
## FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS

250) Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

251) The RICO claims in this case arise from the actions of certain administrative, higher ranking officials at the Kennebec County Correctional Facility and the Kennebec County Sheriff's Department in their individual capacities who conduct an association-in-fact enterprise through the abuse of their various positions. The members of this association-in-fact enterprise commit criminal acts in violation of Maine State law, in a criminal conspiracy, which serves to advance in pay and promotion themselves and certain favored staff. In so doing, the association-in-fact has engaged in unlawful conduct such as extortion, official oppression, aggravated forgery, wrongful termination, forcing premature retirement and permitted the long term sexual harassment and discrimination of its staff.

252)     Specifically, the association-in-fact Enterprise (hereinafter referred to as "AIFE") is a syndicate which consists of Defendants Ryan Reardon, Marsha Alexander, Calista Campbell, Laura Briggs, Jessica Quinn and Dennis Cyr.

253)     For any Racketeer Influenced and Corrupt Organization (RICO) case, it is important to distinguish between legitimate organizations, businesses, and even government offices and the abuse of those entities for illegal purposes by the unofficial, corrupt —enterprise. The AIFE within the Kennebec County Sheriff's Office and the Kennebec County Correctional Facility engages in criminal activity, dereliction of duties with the intent to cause harm to Corrections Officers, encouraging a hostile work environment as a means to force Corrections Officers out of their jobs and large-scale discriminatory practices in an attempt to "rid the jail of lesbian" personnel.

254)     The AIFE has fired highly decorated lesbian employees in order to place their own friends and family into positions of power and authority.  They have secured all top positions within the Kennebec County Sheriff's Office and the Kennebec County Correctional Facility so that there is no recourse for Officers who have been aggrieved by this AIFE.  This AIFE has conspired to commit criminal acts such as coercing statements, generating false documents, and falsifying statements within employee files to cover up wrongful acts perpetrated by themselves and other favored Kennebec County Sheriff's Office and the Kennebec County Correctional Facility employees who inflict sexual harassment and discrimination upon colleagues.

255)     The AIFE has infiltrated the Union so that Corrections Officers are unable to turn to their Union for redress of complaints against administration or other harassing colleagues.

256)      This AIFE has gained power with each advancement up the chain of command. Currently, they have a stronghold on the top positions of leadership within the Kennebec County Sheriff's Office and the Kennebec County Correctional Facility and are engaging in criminal activity against Corrections Officers and inmates.

257)      This case is brought by three Plaintiffs who have suffered great injury as a result of the crimes and dereliction of duty by this AIFE.

258)      Each RICO Defendant is a "person" capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961(3).

259)      Kennebec County Sheriff's Office, Corrections Division is an enterprise as defined by 18 U.S.C. §1961(4) in that it is a legal entity whose mission is "to serve and protect the community by providing a secure and humane environment for those entrusted to [its] custody... As an integral part of the Criminal Justice System, [its] vision is to strengthen public safety by achieving excellence in correctional practices." Citation: KCSO website.

260)      The RICO Defendants comprise an association-in-fact enterprise within the Kennebec County Sheriff's Office, Corrections Division.

261)      The RICO Defendants are: Ryan Reardon, Marsha Alexander, Calista Campbell, Laura Briggs, Jessica Quinn and Dennis Cyr.

262)      Each RICO Defendant violated 18 U.S.C. §1962(c), (d) and (b) by the acts described in the prior paragraphs and as further described below.

263)      The activity of the enterprise affects interstate commerce in that the Kennebec County Sheriff's Office, Corrections Division receives federal funding from the United States Department of Justice.  The RICO Defendants improperly divert federal funding

when they promote themselves to higher ranking regardless of qualifications, and receive pay raises.  These promotions serve to empower the criminal conspirators and reward them with financial gain to further the criminal conspiracy they engage in.

264)    The RICO Defendants misuse federal funding to reward favored personnel who engage in acts to discrimination, sexual harassment and workplace hostility with promotions and pay raises.  The misuse to federal funds constitutes activity of the enterprise which affects interstate commerce.

265)    The RICO Defendants engaged in a "pattern of racketeering" in that they have committed at least two acts of racketeering activity which are related and continuous. The RICO Defendants have engaged in racketeering activity as far back as (when Huard was fired).  The pattern of racketeering continued on a regular basis as late as June 25, 2015 when Deborah Huard was forced into premature retirement and continues to this date.

266)    The racketeering acts are related to the goal of the AIFE, and that is to rid the jail of lesbians and to secure the senior-most ranking positions for those within the AIFE. The events complained of herein are not isolated but have continuity.  As of the date of this complaint, the high ranking administrative RICO Defendants are scheming to revise the jail's hierarchal staffing to advance RICO Defendant Laura Briggs to a higher position with greater pay.  The RICO Defendants propose to eliminate the Staff Sergeant position at the jail and establish a second position of Lieutenant so that Laura Briggs can be advanced.  This amounts to the abuse of power and rewards RICO Defendant Laura Briggs for her crimes against Corrections Officers, inmates and subsequent cover-ups through the use of false statements, and missing investigatory reports.

267)      The racketeering activity the AIFE engaged in includes extortion under the color of right, multiple criminal offenses such as Theft by Extortion in violation of 17-A M.R.S.A. §355, Aggravated Forgery in violation of 17-A M.R.S.A. §702(1)(D), Official Oppression in violation of 17-A M.R.S.A. §608, and discrimination in violation of State and Federal law as itemized above.

### RACKETEERING ACTIVITY

268)      That at all times material to this Complaint, DiGiacomo, Huard and Caudill were engaged in employment with the Kennebec County Sheriff's Office, Corrections Division, and under the authority of its higher ranking administrative personnel.

269)      Under the color of right, the RICO Defendants being the higher ranking administrative personnel did unlawfully engage in extortion of each of the Plaintiffs by threatening their employment and actually terminating or forcing into early retirement the Plaintiffs in this action.

270)      This extortion was unlawful in that the RICO Defendants used their legitimate governmental power to receive actual personal benefit in the form of promotions for themselves and other favored employees through the taking of Plaintiffs' property which is their positions within the agency, earnings from employment and other substantial benefits afforded Corrections Officers.

271)      The RICO Defendants did obtain the property of the Plaintiff Huard with her consent having been induced by the wrongful use of actual and threatened force and fear that she would lose her job in that the defendant did wrongfully terminate and, when she regained her employment being demoted to Corrections Officer, did   force Plaintiff Huard into premature retirement.   Plaintiff Huard was wrongfully terminated from her

Staff Sergeant position so that Calista Campbell could be promoted from Clerical Specialist/mail clerk to Staff Sergeant although she was not qualified for the position since she was not Corrections Officer certified. Thereafter, when Plaintiff Huard was rehired, being demoted from her Staff Sergeant position to Corrections Officer, the AIFE engaged in unlawful age and physical disability discrimination to create a hostile work environment for Plaintiff Huard. From February 25, 2015, the RICO Defendants refused to abide by her multiple notes from Doctors (including the County's preferred provider Concentra) that Huard was ordered "No Overtime." After months of trying to resolve this refusal to abide by multiple doctor orders, Huard was offered a deal to be scheduled less hours in exchange for her commitment to retire by a date certain within the year which the AIFE demanded she put in writing. Huard had no choice but to commit and follow through with premature retirement as a result of the RICO Defendants wrongful use of force and fear of economic harm. All in violation of Title 18, United States Code, Section 1951.

272)     The RICO Defendants did obtain the property of Plaintiff DiGiacomo with her consent having been induced by the wrongful use of actual and threated force and fear that she would lose her job in that the RICO Defendants refused to investigate DiGiacomo's complaints of sexual harassment, discrimination based on religion, gender and sexual orientation.     After nearly two years of enduring this hostile work environment and complaining about it consistently to her supervisors and high ranking RICO Defendants, this AIFE concocted a scheme to accuse DiGiacomo of the violations she complained of.     RICO Defendant Laura Briggs engaged in submitting false statements in order to slander DiGiacomo and force her out of her job. Other Corrections

Officers were forced by coercion to generate statements against DiGiacomo. The RICO Defendants disclosed confidential information to other Corrections Officers who used such information to perpetrate pranks and to make harassing comments to DiGiacomo. DiGiacomo had no choice but to consider herself constructively terminated as a result of the RICO Defendants wrongful use of force and fear of economic harm. All in violation of Title 18, United States Code, Section 1951.

273)    The RICO Defendants did obtain the property of Plaintiff Caudill with her consent having been induced by the wrongful use of actual and threated force and fear that she would lose her job in that the RICO Defendants, particularly RICO Defendant Jessica Quinn, conspired to terminate Plaintiff Caudill because of her sexual orientation so that they could secure the position for a mutual friend. After an investigation by the Department of Labor, it was determined that Plaintiff Caudill was wrongfully terminated. As a result of the RICO Defendants wrongful use of force and fear of economic harm, Plaintiff Caudill was terminated from her employment. All in violation of Title 18, United States Code, Section 1951.

## STANDING and INJURY

274)    Plaintiff Diedre M. DiGiacomo has standing to bring this RICO claim in that she is a person who sustained an injury through a repeated pattern of discrimination based on her gender, religion and sexual orientation. She was constructively fired and therefore lost her employment for which she was otherwise qualified by the RICO Defendants in furtherance of their criminal scheme to force out of employment lesbian Corrections Officers. Upon making complaint of discrimination, the RICO Defendants condoned or otherwise promoted the discrimination against DiGiacomo by failing to properly

investigate and reprimand the offenders, and ultimately by terminating DiGiacomo's employment. The injury sustained by DiGiacomo was loss of employment, and therefore, loss of income and substantial benefits conferred upon an employee of the Kennebec County Sheriff's Office, Corrections Division.  DiGiacomo also suffered severe mental and emotional trauma by the systematic abuse of sexual harassment, workplace hostility and discrimination which went without investigation or disciplinary action against her offenders.

275)    Plaintiff Deborah Huard has standing to bring this RICO claim in that she is a person who sustained an injury by first being wrongfully terminated on fabricated charges to advance Calista Campbell to the position of Staff Sergeant.  Calista Campbell was unqualified for the position as she had not received Corrections Officer training and was a mail clerk.  Calista Campbell is related to Ryan Reardon who held a high ranking position.  To advance his cousin from the mail room to Staff Sergeant, Huard had to be fired.  After being re-employed by the organization, Huard was then forced to retire due to the refusal to abide by her multiple doctors orders of "No Overtime."  The injury sustained by Huard was loss of employment, and therefore, loss of income and substantial benefits conferred upon an employee of the Kennebec County Sheriff's Office, Corrections Division.  Huard also suffered severe mental and emotional trauma by the systematic abuse of sexual harassment, workplace hostility and discrimination which went without investigation or disciplinary action against her offenders.

276)    Plaintiff Cheri Caudill has standing to bring this RICO claim in that she is a person who sustained an injury through a repeated pattern of discrimination based on her sexual orientation.  When certain RICO Defendants learned that Caudill is a lesbian, they

engaged in the conduct of conspiring to terminate her employment through unlawful means. Plaintiff Caudill was targeted for termination when her homophobic co-worker, RICO Defendant Jessica Quinn, learned that Caudill is gay.  Plaintiff Caudill was targeted for false allegations of wrongdoing and subsequently wrongfully terminated without having had due process.   The injury sustained by Caudill was loss of employment, and therefore, loss of income and substantial benefits conferred upon an employee of the Kennebec County Sheriff's Office, Corrections Division. Caudill also suffered severe mental and emotional trauma by the systematic abuse of sexual harassment, workplace hostility and discrimination which went without investigation or disciplinary action against her offenders.

## COUNT XIII
## Violation of RICO § 1962(c)

277)    Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

278)    This Count is against Defendant Ryan Reardon, Marsha Alexander, Calista Campbell, Laura Briggs, Jessica Quinn and Dennis Cyr (the "Count XIII Defendants"). Kennebec County Sheriff's Office, Corrections Division and each of the named Defendants is an enterprise engaged in and whose activities affect interstate commerce. The Count XIII Defendants are employed by or associated with the enterprise.

279)    The Count XIII Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding the Plaintiffs, defrauding and/or deceiving other agencies, and wrongfully terminating Plaintiffs. Specifically:

a)   The Count XIII Defendants committed the criminal offense of aggravated forgery in violation of 17-A M.R.S.A. §702(1)(D) in that Defendant Laura Briggs, with the endorsement of Defendants Ryan Reardon, Marsh Alexander, Calista Campbell and Dennis Cyr did falsely make statements as part of the official records contained at Kennebec County Correctional Facility with the intent to defraud or deceive official investigations with the Office of Professional Responsibility and the Maine Human Rights Commission.

b)   The Count XIII Defendants committed the criminal offense of aggravated forgery in violation of 17-A M.R.S.A. §702(1)(D) in that Defendant Dennis Cyr, with the endorsement of Defendants Ryan Reardon, Marsh Alexander, Calista Campbell and Laura Briggs, did coerce Corrections Officers into falsely making statements as part of the official records contained at Kennebec County Correctional Facility with the intent to defraud or deceive official investigations with the Office of Professional Responsibility and the Maine Human Rights Commission.

c)   The Count XIII Defendants committed the criminal offense of theft by extortion in violation of 17-A M.R.S.A. §355 by exercising control over the property of the Plaintiffs (their employment) as a result of extortion with the intent to deprive the Plaintiffs of their property and committed acts to cause substantial harm to the Plaintiffs health, safety, calling, career, financial condition, and reputation.

d)   The Count XIII Defendants committed the criminal offense of Official Oppression in violation of 17-A M.R.S.A. §608 in that on numerous occasions, against all three Plaintiffs, the Defendants as public servants and acting with the intention of benefitting themselves and to harm the Plaintiffs, committed unauthorized acts which

purported to be acts of their offices, knowingly refrained from performing duties imposed upon them by law or clearly inherent in the nature of their offices. Specifically:

    a.   On each occasion that Plaintiff DiGiacomo complained of sexual harassment and hostile work environment, the Count XIV Defendants had a duty to investigate the allegations. At no time did any high ranking or human resource personnel investigate the complaints of religious and sexual harassment and hostile work environment.

    b.   On each occasion that Plaintiff Huard presented a doctors order of "no overtime" due to her foot condition, the Count XIV Defendants had a duty to abide by the orders but instead, sought to force Plaintiff Huard into overtime hours in an effort to terminate her employment.

    c.   On each occasion that Defendant Jessica Quinn made a false allegation of wrongdoing by Plaintiff Caudill, the Count XIV Defendants had a duty to investigate the charges. Defendant Quinn's false allegations were accepted as true without providing Plaintiff Caudill the benefit of defending herself.

e) The Count XIII Defendants committed violations of due process by denying Plaintiff Caudill with a means to defend against allegations lodged against her by a homophobic co-worker. The named Defendants orchestrated an unlawful means to terminate Plaintiff Caudill through the abuse of their positions.

f) The Count XIII Defendants committed the abuse of their positions of power and authority by wrongfully terminating Plaintiff Huard so that co-conspirator Calista

Campbell could obtain her position as Staff Sergeant, despite the fact that she was not otherwise qualified for the Staff Sergeant position.

g) The Count XIII Defendants engaged in a systematic targeting of gay female Corrections Officers to terminate their employment either by forcing their resignations or generating investigations which would cause the gay female Corrections Officer to be fired or to voluntarily resign.

h) The Count XIII Defendants engaged in a systematic pattern of promoting to higher ranking positions only those employees who support their religious views and personal homophobic agendas and by promoting friends and family members despite their lack of qualifications.

280)     Pursuant to and in furtherance of their fraudulent scheme, the Count XIII Defendants committed multiple related acts of, among other offenses, aggravated forgery, theft by extortion, official oppression, violations of due process, abuse of their power and positions, and systematically targeting lesbian Officers for termination.

281)     The acts of, among other offenses, aggravated forgery, theft by extortion, official oppression, violations of due process, abuse of their power and positions, and systematically targeting lesbian Officers for termination set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

282)     The Count XIII Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

283)     As a direct and proximate result of the Count XIII Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their

business and property in that: each Plaintiff suffered economic loss upon the premature and wrongful termination of their employment.

a. Post Traumatic Stress Disorder;

b. Bankruptcy;

c. Loss of primary residence;

d. Financial distress; and

e. Loss of retirement benefits.

284)     Plaintiffs request relief as described in the Prayer for Relief below.

## COUNT XIV
## Violation of RICO § 1962(b)

285)     Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

286)     This Count is against Defendant(s) [name of defendant] (the "Count XIV Defendants").

287)     Kennebec County Sheriff's Office, Corrections Division is an enterprise engaged in and whose activities affect interstate commerce.

288)     The Count XIV Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity. Specifically:

a) That the named Defendants engaged in the abuse of their power and positions by using unlawful means to promote certain favored employees while wrongfully terminating others.

b) That the Count XIV Defendants engaged in a systematic pattern of violations in the Maine Human Rights Act by failing to investigate complaints of sexual harassment

and discrimination which was targeted to remove all female gay Corrections Officers from employment.

c) That the Count XIV Defendants specifically promoted the sexual harassment offenders to higher ranking positions. The sexual harassment offenders include, but are not limited to, Officers Cipriano, Rogue, and Underwood.

d) That the Count XIV Defendants promoted themselves within the agency to maintain positions of power despite otherwise not being qualified for positions in violation of Maine's Criminal Code or by failing to investigate and discipline criminal acts which they engage in.

e) Specifically, Defendant Calista Campbell who did not have Corrections Officer certification was promoted to Staff Sergeant. A requirement that the Staff Sergeant be Corrections Officer certified existed at the time of her promotion but was later changed so that the promotion would be effective.

f) Specifically, in December of 2015, Defendant Laura Briggs perpetrated constitutional violations against certain inmates by purposefully and without the inmate's consent, she allowed Nurse Kim Vigue, in her presence and upon her orders, to inject a female inmate with medication not prescribed for her, saline solutions and forced a suppository medication.

g) Specifically, in October 2015, Defendant Calista Campbell perpetrated constitutional violations upon a male inmate. Without justification, Campbell ordered an inmate to be secured without clothing in a "turtle suit" and strapped him onto a board for excessive amounts of time when in fact two mental health professionals determined the inmate was not suicidal.

h) That the Count XIV Defendants engaged in a pattern of discrimination against female Corrections Officers by segregating them from training in "Intake" and then citing their failure to know "Intake" procedures as cause for failing to promote them to higher ranking positions.

i) That the named Defendants engaged in falsifying documents to secure their positions of power and terminate targeted gay female Corrections Officers.

j) That the Count XIV Defendants engaged in coercion of Corrections Officers to generate false statements against DiGiacomo in an effort to cover up their scheme of discrimination and failure to properly investigate and discipline sexual harassment and discrimination offenders.

k) That since September 2014 when Defendant Calista Campbell was promoted from mail clerk to Staff Sergeant (and then Lieutenant shortly thereafter), at least 5 female gay Corrections Officers (including Plaintiffs) were investigated and terminated on false grounds while sexual harassment offenders and other personnel engaged in large-scale discrimination received promotions to higher ranks.

l) That the Count XIV Defendants, in their efforts to maintain a stronghold of power, infiltrated the Union decision making roles by appointing Laura Briggs to the Union Board.   As a Union board member who also has authority to investigate and discipline Corrections Officers, Defendant Laura Briggs abused her power and authority by committing unlawful acts against inmates and compels Corrections Officers to participate.  Corrections Officers have no recourse through the Union to protect their rights as the Union is run by high ranking Kennebec County Sheriff's Department, Corrections Division personnel.

289)     The Defendants have acquired and now maintain their interest in the enterprise by the promotion of family and friends into high ranking positions. Defendants Reardon and Alexander secured the uppermost ranking positions and in so doing, now have filled each of the high ranking positions through nepotism.

290)     The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

291)     The Count XV Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

292)     As direct and proximate result of the Count XIV Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property in that: the Plaintiffs were denied promotions, targeted for termination and wrongfully discharged from employment.

293)     Plaintiffs request relief as described in the Prayer for Relief below.

## COUNT XV
## Violation of RICO § 1962(d)

294)     Plaintiffs incorporate and restate each of the above paragraphs as if fully set forth herein.

295)     This count is against Defendant(s) [name of defendant] (the "Count XV Defendants").

296)     As set forth above, the Count XV Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). Specifically:

a.  The County XV Defendants conspired  to acquire or maintain interests in the enterprise through a pattern of racketeering activity (§ 1962(b)) by using nepotism to promote themselves and/or each other to the highest ranking positions within the enterprise; and

b.  Participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c)) by committing numerous criminal acts in violation of Federal and Maine State law to unlawfully terminate employees, commit crimes against inmates, and to cover-up criminal activity through the use of falsified statements.

297)  The Count XV Defendants have intentionally conspired and agreed to acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Count XV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(b) and (c), in violation of 18 U.S.C. § 1962(d).

298)  As direct and proximate result of the Count XV Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that:

a.  The Plaintiffs have suffered economic loss;

b.  The Plaintiffs are precluded from employment with other law enforcement agencies due to the nature of their terminations;

    c.  The Plaintiffs have suffered emotional distress, including Post Traumatic Stress Disorder; and

    d.  Plaintiff Caudill has lost her primary residence and is forced to file a Chapter 7 Bankruptcy petition since her income has been drastically reduced.

WHEREFORE, Plaintiffs respectfully request the following relief:

A.  that this Court enter judgment against the Defendants for violations of the RICO Act as follows:

    a.  An order against all RICO Defendants to divest themselves of any interest, direct or indirect, in The Kennebec County Sheriff's Office and/or the Kennebec County Sheriff's Office, Corrections Division;

    b.  actual damages for the economic loss suffered by each Plaintiff;

    c.  treble damages as permitted by 18 U.S.C. §1964(c); and

    d.  attorney's fees.

B.  Enter a declaratory judgment that the practices complained of in this complaint are unlawful and violate Title VII of the Civil Rights Act of 1964 and the Maine Human Rights Act;

C.  Grant all injunctive relief necessary to bring Defendants into compliance with the aforementioned laws;

D.  Order Defendants to pay the wages, salary, employment benefits, and other compensation denied or lost to Plaintiff-Intervenor Khan to date by reason of Defendants' unlawful actions, in amounts to be proven at trial;

E.  Order Defendants to pay compensatory damages for Plaintiffs DiGiacomo, Huard and Caudill's emotional pain and suffering, in an amount to be proven at trial;

F. Order Defendants to pay exemplary and punitive damages;

G. Order Defendants to pay attorneys' fees and costs of the action;

H. Order Defendants to pay interest at the legal rate on such damages as appropriate, including pre- and post-judgment interest; and

I. Grant such other and further relief that the Court deems just and proper.

Dated at Waterville, Maine, this 15th day of September, 2016

/s/ Jackie T. DiGiacomo, Esq
_____
Jackie T. DiGiacomo, Esq.
Maine Bar Number 004620
Attorney for Debtor(s)
PO Box 1837
Waterville, ME 04903
(207) 361-4700