# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| DEBORAH HUARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 1:16-cv-00473-GZS |
| | ) | |
| KENNEBEC COUNTY, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION

This case is one of three related cases brought by former female corrections officers against Kennebec County and multiple employees of Kennebec County alleging various discriminatory and illegal practices at the Kennebec County Correctional Facility. While this case originally included the claims of all three plaintiffs, the Court ordered the claims of the three plaintiffs severed after the close of discovery. (See Order on Mot. to Sever (ECF No. 56).)

Now before the Court is Defendants' Motion for Judgment on the Pleadings and for Summary Judgment (ECF No. 70). For reasons explained herein, the Court GRANTS IN PART AND DENIES IN PART the Motion.

## I. MOTION FOR JUDGMENT ON THE PLEADINGS

Before the Court turns its attention to Defendants' arguments for summary judgment, the Court considers two discrete issues for which Defendants seek judgment on the pleadings in accordance with Federal Rule of Civil Procedure 12(c). In considering these arguments, the Court has reviewed Plaintiff's Amended Complaint (ECF No. 3) and accepted all of her "well-pleaded factual averments" and drawn "all reasonable inferences in her favor." Feliciano v. Rhode Island,

160 F.3d 780, 788 (1st Cir. 1998). The Court recognizes at the outset that judgment on the pleadings may be entered where the complaint fails to "contain sufficient factual matter to state a claim to relief that is plausible on its face." Grajales v. Puerto Rico Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012) (internal citations omitted). Indeed, "[t]o cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Id. at 44–45.

First, the individual Defendants[1] seek judgment on the employment discrimination claims that remain pending against them (Counts I, II, VIII, IX & X)[2] arguing that there is no individual liability under the respective federal and state statutes. On this point, the Court agrees with Defendants. The First Circuit has clearly held that "there is no individual employee liability under Title VII." Fantini v. Salem State Coll., 557 F.3d 22, 30 (1st Cir. 2009). Likewise, the First Circuit has applied the same holding to the ADA. See Roman-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 52 (1st Cir. 2011) (holding that "Title I of the ADA, like Title VII of the Civil Rights Act, addresses the conduct of employers only and does not impose liability on co-workers") (internal quotation and citation omitted).

With respect to Maine's companion state statute, the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 et seq., this Court has previously held, "there is no individual liability under the MHRA." Charette v. St. John Valley Soil & Water Conservation Dist., No. 1:17-CV-35-GZS, 2017 WL 2683951, at *12 (D. Me. June 20, 2017) (discussing Fuhrmann v. Staples Office

---

[1] The named individual Defendants in this case are: Ryan Reardon, Marsha Alexander, Calista Campbell, Laura Briggs, Jessica Quinn, Terry York, Randall Liberty, Nancy Rines, Dan Cyr, Bob Devlin, George M. Jabar II, and Patsy Crockett.

[2] At Plaintiff's request, the Court has already dismissed the Maine Whistleblower Act claim (Count III) as to the individual Defendants and all claims as to Jessica Quinn. See Plaintiff's Consented-to Motion to Dismiss Certain Claims (ECF No. 59) & 6/13/2018 Endorsement Order (ECF No. 60).

Superstore East, Inc., 58 A.3d 1083 (Me. 2012)).  While Plaintiff has cited a 2013 guidance memorandum from the Maine Human Rights Commission[3] as offering support for individual liability after Fuhrmann, the Court does not believe this memo can override the clear case law that supports judgment as a matter of law in favor of the individual Defendants named in this case. See, e.g., United States ex rel. Worthy v. E. Maine Healthcare Sys., No. 14-cv-00184-JAW, 2017 WL 211609, at *32 (D. Me. Jan. 18, 2017) (concluding that "only an employer can be liable" for employment discrimination and whistleblowing retaliation); Fisk v. Mid Coast Presbyterian Church, No. 16-cv-00490-JDL, 2017 WL 1755950, at *4-5 (D. Me. May 4, 2017).[4]  Thus, the Court concludes that each individual Defendant is entitled to judgment on the pleadings as to Plaintiff's statutory employment discrimination claims (Counts I, II, VIII, IX & X).

Next, Defendants seek judgment on the pleadings as to Count XVI, which Plaintiff's First Amended Complaint describes as "criminal liability of Kennebec County, Kennebec County Sheriff's Office and its Corrections Division, Kennebec County Correction Facility, Kennebec County Commissioners and Kennebec County Administrator" and cites 17-A M.R.S.A. § 60. (First Am. Compl. (ECF No. 3), PageID # 145).  As framed, this Count fails to state a claim upon which Plaintiff could recover any relief in the context of this civil case.  See, e.g., Larrabee v. Penobscot Frozen Foods, Inc., 486 A.2d 97, 101 (Me. 1984).  To the extent Plaintiff has argued

---

[3] See Memorandum from John P. Gause to Maine Human Rights Commission Staff (April 11, 2013), https://www.maine.gov/mhrc/guidance/memo/20130411_g.pdf (cited in Pl. Response (ECF No. 74), PageID # 552.)

[4] After the parties completed briefing on the present motion, the First Circuit issued its decision in Roy v. Correct Care Solutions, LLC, 914 F.3d 52 (1st Cir. 2019).  In Roy, the First Circuit held that Fuhrmann does not foreclose individual third-party liability under 5 M.R.S.A. § 4633.  See id. at 65-67.  However, in so holding, the Roy court noted that it took "no position on whether § 4633 would allow [a claim against an individual supervisor employed by the plaintiff's employer]."  Id. at 65 & n.7.  Given this caveat and prior precedent, the Court reads Roy as opening the door to § 4633 claims "against third parties not alleged to be agents of the employer."  Id.  None of the individual Defendants named here fall into that category.  As a result, the Court concludes that Roy's holding does not allow Plaintiff to state a plausible claim against the individual Defendants in this case.

that Count XVI should be read to state a plausible civil RICO claim, the Court notes that Plaintiff's civil RICO claims are captured in Counts XIII-XV.

Therefore, the Court grants Defendants' request for judgment on the pleadings as to all Defendants on Count XVI and as to the individually named Defendants on Counts I, II, VIII, IX & X. The Court next considers Defendants' request for summary judgment on Plaintiff's remaining claims.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. See Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

### B. Factual Background[5]

Defendant Kennebec County[6] is ultimately overseen by three elected county

---

[5] The Court notes that all requests to strike contained in Defendants' Reply Statement of Material Facts (ECF No. 82) are granted based on Plaintiff's failure to respond to these requests. See D. Me. L.R. 56(e). Likewise, the Court grants Plaintiff's requests to strike paragraphs 29 and 34 based on the Court's inability to locate the supporting citations in the record. See Pl. Response SMF (ECF No. 75), PageID # 585.

[6] Plaintiff has separately named as Defendants various entities that fall under the umbrella of Kennebec County, including Kennebec County Sheriff's Office, the Corrections Division, Kennebec County Correctional Facility (together with Kennebec County, the "Kennebec County Defendants"). The Court considers any claims against these entities, as well as any claims stated against individual defendants in their official capacities, as claims against Kennebec County. See Allen v. York Cty. Jail, No. CIV. 01-224-P-C, 2003 WL 221842, at *7 (D. Me. Jan. 30, 2003),

commissioners, Patsy Crockett, Nancy Rines, and George Jabar, each of whom is named as a Defendant in this case in both their individual and official capacities. The County Commissioners promulgate and amend the Kennebec County Administrative Regulations, which serve as the internal policies for the county. The day-to-day administration of Kennebec County is handled by County Administrator Bob Devlin and Human Resources Manager Terry York, both of whom are likewise named as individual Defendants in this case.

Defendant Kennebec County Sheriff's Office operates as a department within the county government run by an elected Sheriff. From January 2007 until September 2015, Defendant Randall Liberty was the Kennebec County Sheriff. Upon Liberty's departure, Defendant Ryan Reardon was promoted to the position of interim sheriff. Prior to that promotion, Reardon, who began working for Kennebec County in January 2007, spent approximately two years as chief deputy and approximately two years as the assistant corrections administrator.

Within the Sheriff's Office, there is a Corrections Division that operates the county jail, also known as the Kennebec County Correctional Facility ("KCCF"). Various KCCF employees make up the remainder of the individually named Defendants in this case, including:

- Marsha Alexander, who began working for Kennebec County in 1998, and worked as the assistant corrections administrator from May 2006 until August 2011, and then the jail administrator from August 2011 until March 2017.

- Laura Briggs, who began working for Kennebec County in September 2003 and was promoted to a corporal in February of 2012, then to a sergeant in November 2013, then a staff sergeant in August 2015, and a lieutenant in October 2016. Briggs left her employment with Kennebec County on January 6, 2017.

report and recommendation adopted, No. CIV. 01-224-P-C, 2003 WL 848287 (D. Me. Mar. 5, 2003) ("[S]uits against municipal subdivisions . . . are in essence suits against the municipality.)

- Calista Campbell, who began working for Kennebec County as a clerical specialist in November 2010. Campbell was promoted to staff sergeant in February 2013 and then again promoted to assistant corrections administrator in January 2014.

- Jessica Quinn, who was hired as a clerical specialist at KCCF in July 2011. Quinn then became a part-time corrections officer in November 2012. In March 2016, she became the KCCF programs director.

- Dan Cyr, who was employed as a sergeant at KCCF from July 2011 through August 2016.

Plaintiff Deborah Huard worked for Defendant Kennebec County for approximately 25 years.[7] She began working in Kennebec County's corrections department in 1989. For approximately twenty years of her tenure, Huard had the rank of a staff sergeant. As Staff Sergeant, Huard had a deep loyalty for Kennebec County and was committed to serving the County, its citizens, and its Sheriff. For the period relevant to this case, Huard was also a member of the union. As a member of the union, Huard was subject to the Collective Bargaining Agreement between Kennebec County and the National Correctional Employees Union (hereinafter, "CBA"), which provides covered employees certain rights regarding discipline and discharge. (See CBA (ECF No. 75-31), PageID #s 754-55.) Under the CBA grievance procedure, aggrieved employees must pursue a grievance first with the correctional facility administrator, and can thereafter bring their grievance to the County Commissioners. If the Union finds the Commissioners' decision unacceptable, it may also seek to arbitrate the grievance before the Maine Board of Arbitration and Conciliation.

---

[7] While Huard's employment was treated as one uninterrupted term spanning twenty-five years, Huard was suspended for approximately two months in 2012.

In 2007, Huard moved from the position of training sergeant to compliance manager. In her performance appraisal for the first half of 2008, Alexander favorably highlighted Huard's work as a compliance manager noting that she "designed an efficient 'tabbing system' for compliance folders." (Pl. Ex. 14 (ECF No. 75-23), PageID # 699.) It was further noted that the Department of Corrections Monitor had "complimented [Huard] on this efficient process" and "referred other agencies to [her] for guidance." (Id.)

Huard again received a strong performance appraisal from Alexander for the period of July 1, 2010 through June 30, 2011. Alexander described Huard as a "steadfast employee" who took "great pride in the thoroughness of the compliance folders," made "methodical decisions concerning issues and problems," and utilized "effective communication skills when dealing with the public, inmates, or staff." (Id. at PageID #s 704-05.) Huard's noted performance strengths included "communication skills," "team player," and "dedicated employee." (Id. at PageID # 707.) This appraisal also noted that Huard was both the Union Shop Steward and served as a substitute assistant corrections administrator.

**2011**

In 2011, there were leadership changes at KCCF. As noted in the Command Staff Meeting Minutes for October 4, 2011, Captain Alexander and Lieutenant Reardon had both been promoted into new roles and were "establishing a 'new normal' for the jail." (Pl. Ex. 16 (ECF No. 75-25), PageID # 729.) According to at least one other employee, once Alexander became the jail administrator, she "was running the show" inside KCCF with "limited supervision." (Morin Dep. (ECF No. 75-7), PageID # 635.) Alexander, in turn, maintained personal friendships with Briggs, Campbell, and Quinn, all of whom were heterosexual. Because of these friendships, other employees viewed all four women (Alexander, Briggs, Campbell & Quinn) as having "certain

perks" as well as the ability to influence how the facility was run.  (Heavey-Morin Dep.  (ECF No. 75-9), PageID # 647.)  However, many other KCCF employees were "worried about their jobs" and "the number and the constant investigations that were going on."  (Morin Dep. (ECF No. 75-7), PageID # 634.)

**2012**

The change in KCCF leadership was reflected in Huard's January 17, 2012 Performance Appraisal, which covered the period of July 1, 2011 through December 31, 2011.  For this appraisal, Huard's performance was rated by Reardon and then reviewed by Alexander.  This Appraisal described Huard as a "dedicated employee."  However, the Appraisal also noted that some of Huard's compliance work was deemed "unorganized" and in need of attention during a recent inspection by Maine Department of Corrections ("MDOC").  (Pl. Ex. 14 (ECF No. 75-23), PageID #s 711-12.)

The compliance inspection referenced in this performance appraisal was Huard's second inspection and Reardon's first inspection.  In fact, Reardon had no knowledge of the inspection process prior to his promotion to Lieutenant in September 2011.  To prepare for her second inspection, Huard had placed the previously reviewed documents from the first inspection behind the new documents.  Huard had been advised to organize the documents in this order by Tim Piekart of MDOC. [8]  Ultimately, the consequence of this placement was that it took approximately five minutes for the compliance inspector to review the files instead of the traditional two minutes.  Huard contacted Piekart again after the inspection and inquired again

---

[8] Piekart was responsible for the training of jail personnel for compliance inspection process and had trained Huard. Huard called Piekart to ask what she should do with the first inspection paperwork and he advised that she should put the documents from the first compliance inspection in the back of the folders for reference purposes.  As it turned out, this incorrect advice from Piekart led to the issue with numerous folders needing attention during the compliance inspection, as referenced by Reardon.

about the documentation for the first inspection. Piekart again stated that in accordance with the training he had received, the older documents should be placed in the back of the subsequent inspection documents.

Huard advised Reardon of her conversation with Piekart. However, Reardon maintained that the documents were organized improperly. He stated to Huard on multiple occasions that because these folders needed attention, there was a risk of the jail losing its license. Based on her five years of experience as Compliance Manager, Huard disagreed with Reardon's statement regarding this risk.

As noted in the minutes of the January 24, 2012 Command Staff meeting, Reardon did not "have confidence in assigning the ACA accreditation compliance responsibility to SSgt. Huard." (Pl. Ex. 16 (ECF No. 75-25), PageID # 731.) Rather, the Command Staff discussed "reassignment options for SSgt. Huard," including "having [Huard] work . . . to process and organize the evidence room, having full responsibility, without the support of clerical or other staff to assist in paperwork or computer tasks . . . Lt. Reardon would also have her responsible for shift schedules . . . and remove her from the Chain of Command during after-hours." (Id.) The minutes of the next Command Staff meeting on February 7, 2012 reflect continuing concerns about Huard's performance with Sheriff Liberty acknowledging that "SSgt. Huard is failing in her position but would like to make an honorable offer to step down . . . relinquish the staff sergeant responsibilities." (Id. at PageID # 733.) At the April 24, 2012 Command Staff Meeting, the issue of moving Huard to a training position was discussed. Because the position did not require a staff sergeant (Huard's current rank), Sheriff Liberty expressed his preference that Huard be voluntarily demoted before any move into a training position, but he ultimately suggested that "more discussion is required about the SSgt and Training positions." (Id. at PageID # 735.)

Huard had no idea that beginning January 2012 the command staff was discussing that she was failing in her position as Staff Sergeant. However, by early 2012, Huard learned of bible study meetings being held on County property during the noon hour. Huard complained to Alexander that this was inappropriate and that it did not belong in the workplace and made her uncomfortable.

In September 2012, Reardon told another KCCF employee that that he just needed to get Huard through the next two years until she retires.[9] Huard had no plan to retire when the conversation took place. Also, some time in 2012 or 2013, another lesbian employee overheard Lieutenant Ryan Reardon say he was "going to get rid of all lesbians."[10] (Dumas. Dep. (ECF No. 75-4), PageID # 616.)

On October 10, 2012, Huard was terminated for "failing to effectively implement a directive." But, she then returned to work in December 2012 after the union negotiated a resolution to her disputed termination that recharacterized the time off as a "suspension" with "all lost wages restored." (Def. SMF (ECF No. 71), Page ID # 464.) As part of that resolution, Huard resigned her staff sergeant position effective December 7, 2012. Huard was no longer the compliance manager and returned to work "as a corrections officer with the seniority intact." (Id.) But for this settlement, Huard could have appealed her grievance to the County Commissioners under the procedures laid out in the CBA.

**2013**

On November 6, 2013, Huard received a step increase and increase in longevity pay of 40 cents.

---

[9] Reardon had this conversation with Sherry McLaughlin, who worked for Kennebec County in the KCCF from October 2006 to September 2012 and held the rank of Sergeant when she was terminated.

[10] The long-term employee, Bobbi-Joe Dumas, did not immediately report this comment but later reported it to a co-worker around the Spring of 2015. (Dumas Dep. (ECF No. 75-4), PageID #s 619-20.) Dumas worked for Kennebec County in the county correctional facility from January 9, 1995 until August 8, 2013. She held the rank of sergeant when she left her employment.

**2014**

In April 2014, Huard reported that she did not feel the biohazard equipment used for cleaning cells was adequate. Within less than a week, maintenance was instructed to order personal protection equipment that met the level of protection needed at the jail. The new equipment came shortly after.

Also, beginning in 2014, Huard, in her union shop steward role, represented a corrections officer who was the target of severe discrimination, sexual harassment, and hostile work environment in several meetings with Cyr, Gardner, and Campbell.

On May 4, 2014, Huard received verbal counseling for contacting departments directly instead of following the chains of command. (See Def. Ex. 2 (ECF No. 71-7), Page ID #s 483-84.) Huard maintained in a written response to this counseling that her contacts had been appropriate attempts to contact the mail room, on one occasion, and to alert staff to a broken lock, on another occasion. In a written reply and confirmation of verbal counseling, Briggs maintained that Huard had inappropriately contacted three different individuals when she should have used her chain of command for each issue. (See Pl. Ex. 1 (ECF No 75-10), Page ID #s 648-49.)

On May 13, 2014, Huard complained to Briggs that working in the control room was aggravating medical issues she had with her legs and feet. Huard indicated she would "get a doctor's note . . . stating she could not work in control." (Joint Ex. A (ECF No. 65-1), PageID # 426.) After having Huard demonstrate that "she had the ability to run control," Briggs ultimately swapped Huard's assignment while awaiting clarification as to Huard's medical restrictions. (Id.) In this 2014 timeframe, Alexander also became aware that working in control was causing Huard leg pain and swelling in her foot. By June 2014, Huard had received a doctor's note restricting her from overtime hours with a recommended re-evaluation in one year.

On June 11, 2014, Huard received a written reprimand for improperly escorting an inmate, including allowing the inmate to walk behind her and to walk directly past the maintenance cart with unsecured tools on top. On June 23, 2014, Huard received a written reprimand for insubordination. On that day, Huard was on the third floor where the inmates had been required to leave their cell toilets unflushed during an extended facility shakedown, which caused a stench in the air. The insubordination apparently related to Huard's expressing that Brigg's denial of a "controlled flush" was "a violation of inmate rights." (Huard Aff. (ECF No. 75-1), PageID # 599.)

On September 7, 2014, Huard received a written reprimand for leaving unsecured scissors in her block when she left for a doctor's appointment. Huard filed a written response to this reprimand in which she indicated that the scissor usage was subject to ongoing, appropriate supervision after she departed. (See Pls. Exs. 2 & 3 (ECF Nos. 75-11 & 12), PageID #s 650-52.)

On October 9, 2014, Huard received a written reprimand for being away from her assigned post for twenty minutes without approval. Huard left her assigned post to provide support to another corrections officer in her role as Union Shop Steward. Huard indicated on the Counseling and Disciplinary Action Form that she would likely appeal this reprimand as she was "getting written up for [actions] when others are not." (Def. Ex. 6 (ECF No. 71-11), PageID # 494.) This written reprimand was later downgraded to a verbal counseling after Huard met with Alexander.

The five disciplinary actions Huard received in 2014 did not result in any change in pay or hours for Huard. On November 6, 2014, Huard received a step increase and increase in longevity pay of 53 cents.

**2015**

Unlike 2014, Huard did not receive any discipline in 2015. Rather, Huard's issues in 2015 mainly surrounded overtime and work restrictions related to her medical issues.[11]

Generally, Kennebec County requires that employees provide medical documentation of work limitations and restrictions. Although Huard had obtained a medical note regarding her leg and foot restriction in 2014, in February 2015, Kennebec County sent Huard for a medical evaluation with Concentra to determine her ability to work in excess of forty hours a week given her lower extremity issues. The initial result of Huard's February 25, 2015 physical was a finding that she was "able to perform essential functions" but was subject to a "permanent" restriction of "no overtime due to feet issues." (Pl. Ex. 6 (ECF No. 75-15) PageID # 655.)

On February 26, 2015, the restriction was amended to "no overtime that requires standing greater than 50 %" of the shift. (Def. Ex. 11 (ECF No. 68-1), PageID # 431.) Prior to this amendment of Huard's restrictions, Terry York relayed additional information to Chretien by email and phone. Among the items York sent to Concentra were a portion of the union contract for the sixth shift, along with York's representation that the County had "the ability to accommodate . . . Huard's need to sit and can have her work her overtime shift in control where she can stand, move around or sit as needed." (Pl. Ex. 5 (ECF No. 75-14), PageID # 654.) By phone, York told Chretien that Huard was reportedly able to do farm chores despite her medical issues. (York Dep. (ECF No. 75-5), PageID # 625.) Chretien spoke with Huard by phone after receiving the information from York, but he did not re-examine her.

On February 27, 2015, Danielle Doyon, a physician's assistant from Huard's primary care

---

[11] It is undisputed that Kennebec County did not require Huard to work overtime hours from December 2012 through February 2015.

provider wrote a medical note indicating that Huard should not be scheduled to work "overtime shifts, especially night shifts due to pain and medication side effects." (Def. Ex. 12 (ECF No. 68-2), PageID # 432.) This medical note indicated that Huard was expected to have further follow-up with a neurologist in June 2015.

Given the amended work restrictions from Concentra and despite Huard's letter from her primary care provider, Kennebec County proceeded to schedule Huard for overtime work and did not explain to her that it considered her medical notes inadequate. Huard was assigned to spend at least fifty percent of each overtime shift in control, where Huard could sit, stand and change positions as needed. The first day Huard worked an overtime shift was on March 30, 2015, when she worked a four-hour overtime shift. On March 31, 2015, Huard informed her lieutenant that working overtime the night before caused swelling in her legs. (See Pl. Ex. 20 (ECF No. 75-28), PageID # 749.)

On April 2, 2015, Huard provided a handwritten letter to Lieutenant Campbell indicating an intention to retire "sometime in July 2015." (Def. Ex. 7 (ECF No. 71-12), PageID # 495.) The next day, while discussing her stress and anxiety with a physician's assistant at her primary care provider, Huard also expressed her intention to retire. In April of 2015, after discussing the potential of her retirement with Campbell, Huard met with Sheriff Liberty. Liberty agreed to limit overtime to four hours if Huard provided a firm retirement date.

On April 7, 2015, Doyon sent another note indicating that Huard should be restricted to 41.25 hours of work until she could be seen by a foot specialist in May 2015. (See Def. Ex. 13 (ECF No. 68-3), PageID # 433.)

Kennebec County continued to have Huard's requested limitations reviewed by Dr. Brewster, Concentra's area medical director, in the Spring of 2015. In an email to York dated

May 1, 2015, Brewster acknowledged speaking with Huard and telling her she would need a note from a specialist to support the work restrictions she was seeking. (See Def. Ex. 14 (ECF No. 68-4), PageID # 434.) In a letter to York, dated May 4, 2015, Brewster indicated that he had reviewed available medical records and communicated with both Huard's PCP and Dr. Kipp, a podiatrist who had examined Huard. Based on this review, Brewster wrote that there was "no medical contraindication for Ms. Huard to work overtime, as long as [KCCF is] able to accommodate ongoing work limitations," which were to allow sitting for half of any overtime shift. (Def. Ex. 14 (ECF No. 68-4), PageID # 435.) In response, Huard presented a letter from Dr. Richard Sampson, DPM, asking that Huard be restricted from working overtime "due to chronic foot pain." (Def. Ex. 15 (ECF No. 68-5), PageID # 436.)

In May 2015, each overtime shift Huard worked did not exceed 2.25 hours. The last day Huard worked overtime was a two-hour shift on May 21, 2015. All told, in 2015, Huard worked fourteen overtime shifts over approximately a two-month period.

On June 10, 2015, Huard delivered another letter addressed to the "chain of command" indicating that she intended to resign with a last day of June 30, 2015 (Def. Ex. 8 (ECF No. 71-13), PageID # 496.) In a letter dated June 18, 2015, Huard clarified that it was her intention to retire on June 30, 2015, not simply resign. (Def. Ex. 9 (ECF No. 71-14), PageID # 497.) Huard maintains that fear of being fired and demands from her employer motivated her to announce her retirement. (Huard Aff., PageID # 599.) Huard did retire on June 30, 2015.

Huard filed a complaint with the Maine Human Rights Commission ("MHRC") on November 12, 2015. Huard received a "right to sue" letter from MHRC, dated October 5, 2016, as well as a "right to sue" letter from the Equal Employment Opportunity Commission, copies of both letters were sent to Defendants through counsel.

## C. DISCUSSION

Defendants seek summary judgment on all of Plaintiff's remaining claims. These claims essentially fall into four categories: (1) RICO (Counts XIII, XIV & XV), (2) breach of contract (Count XI), and (3) statutory discrimination (Counts I, VIII, IX & X), and (4) statutory retaliation (Counts II & III). The Court considers each of these four categories of claims in turn.

### 1. RICO Claims

While the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, is widely known as a tool for criminal prosecution of organized crime, the statute also has "a generous private right of action" for plaintiffs who can prove "they were 'injured in [their] business or property by reason of a violation of section 1962.'" Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 527 (1st Cir. 2015) (quoting 18 U.S.C. § 1964(c)). As relevant here, "[t]o state a civil RICO claim, . . . a plaintiff must allege: (1) conduct, (2) of an enterprise, (3) through . . . a pattern . . . of racketeering activity." Id. at 528 (internal citations and quotations omitted). A "pattern" of racketeering "requires a plaintiff to show that at least two acts of racketeering occurred within ten years of each other." Id. (citing 18 U.S.C. § 1961(5)). While many types of illegal activities fall under RICO's definition of racketeering, found in 18 U.S.C. § 1961(1), Plaintiff's briefing in this case asserts Defendants' racketeering consisted of "violation of the Hobbs Act, theft by extortion and bribery in official and political matters in violation of state criminal statutes."[12] (Pl. Response (ECF No. 74), PageID # 574.)

---

[12] To the extent that Plaintiff alleges "numerous" other violations of federal and state law that qualify as racketeering for purposes of RICO, Plaintiff has failed to present any argument or evidence that would support a trialworthy claim based on these alternatively alleged acts of racketeering. Additionally, Defendants correctly assert that many of the actions alleged in the Amended Complaint do not qualify as enumerated crimes for purposes of 18 U.S.C. § 1961. (Pl. Response, PageID # 574 (citing the Am. Compl. ¶¶ 303, 324, 325, 328); Def. Motion, PageID #s 457-59.)

As the First Circuit has previously explained, "While it may be theoretically possible to allege a wrongful discharge which results directly from the commission of a RICO predicate act . . . any such safe harbor would be severely circumscribed." Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (quoting Miranda v. Ponce Federal Bank, 948 F.2d 41, 41 (1st Cir. 1991)). As noted in Camelio, RICO claims arising from employment disputes have frequently failed to survive even a motion to dismiss. See id. (noting this was the "fourth time in recent years" such a dismissal was affirmed). In this case, the Court must consider whether Plaintiff has any trialworthy RICO claim based on her allegations that "lesbian personnel at Kennebec County were under constant threat of losing their jobs" and, in fact, lost their jobs as a result of "extortion" by Defendants. (Pl. Response, PageID # 577.)

On the record presented, Plaintiff cannot pass over two critical hurdles to survive summary judgment on her RICO claims. First, Plaintiff has not presented trialworthy evidence that Huard's retirement was proximately caused by any of the predicate acts she alleges. RICO "requires proof that at least one of the defendant's predicate acts was the proximate cause of the plaintiff's injuries." Camelio, 137 F.3d at 670. Here, the trialworthy evidence that any extortion by a named Defendant proximately caused Huard's June 30, 2015 retirement is simply lacking.

Second, even viewing the record in the light most favorable to Plaintiff, there is simply not trialworthy evidence of extortion.[13] Under the Hobbs Act, an act of extortion requires that transferable property move from the victim into the possession of the extortionist. Sekhar v. United States, 570 U.S. 729, 734 (2013) (concluding that a favorable recommendation did not qualify as "obtainable property" under the Hobbs Act). Maine law appears to similarly require that extortion can only occur when a person "obtains or exercises control over the property of

---

[13] Moreover, Plaintiff has not put forward evidence of two separate acts of extortion as required by the statute. See 18 U.S.C. § 1961(5) (laying out requirement of two acts of racketeering within a ten-year period).

another."  17-A M.R.S.A. §§ 352(1) & 355.  Plaintiff asserts a property right in "her right to employment free of discrimination."  (Pl. Response, PageID # 576).  She fails to present evidence that would allow a factfinder to conclude that any of the named Defendants actually obtained her job, such that they were able to control this property interest and pass it to another person.  Thus, even assuming that a factfinder might conclude that one or more of the Defendants took actions that contributed to Huard losing her position with Kennebec County, the record does not support a finding that the job itself was obtainable property.

Therefore, the Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's RICO Claims (Counts XIII, XIV & XV).

### 2.  Breach of Contract Claims

In Count XI, Plaintiff asserts breach of contract based on three different alleged contracts: (1) the union contact (Count XI(A)), (2) the KCCF Policy & Procedure Manual and Kennebec County Administrative Regulations (Count XI(B)), and (3) the Kennebec County Administrative Regulations, specifically Regulation No. 04-04-02 pertaining to restrictions on hiring relatives (Count XI(C)).  Defendants seek summary judgment on all three theories.

As to Count XI(A), Defendants argue that Plaintiff's failure to follow the grievance procedure in the CBA bars her from bringing a claim for breach of that agreement.  In support of their argument, Defendants cite Republic Steel Corp. v. Maddox, 379 U.S. 650 (1965).  In Republic Steel, the Supreme Court held that "individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by the employer and union" and cannot "completely sidestep available grievance procedures in favor of a lawsuit."  Id. at 652-53; see also Hughes v. Univ. of Maine, 652 A.2d 97, 99 (Me. 1995) (affirming dismissal of

employee's complaint and citing <u>Republic Steel</u>). Plaintiff's rebuttal invokes her "nonwaivable" claims under "the MHRC and Title VII." (Pl. Response, PageID # 571.) However, nothing in her argument explains why her breach of contract claim is not subject to the exhaustion requirement cited by Defendants. In short, the Court finds Defendants are entitled to summary judgment on Plaintiff's claim for breach of the CBA based on her failure to exhaust the four-step grievance procedure clearly laid out in the CBA.

As to Count XI(B) & (C), Defendants argue that Plaintiff cannot pursue a breach of contract claim based on the KCCF Policy & Procedure Manual[14] or the Kennebec County Administrative Regulations[15] because such policies do not create an enforceable employment contract. Defendants cite <u>Taliento v. Portland W. Neighborhood Planning Council</u>, 705 A.2d 696, 700–06 (Me. 1997) in support of this argument. In <u>Taliento</u>, the Law Court found the personnel policy at issue did not create an employment contract and affirmed summary judgment in favor of an employer. <u>See</u> <u>id.</u> at 699 (citing <u>Libby v. Calais Reg'l Hosp.</u>, 554 A.2d 1181, 1183 (Me. 1989)).

In responding to Defendants' argument, Plaintiff invokes the CBA and 30-A M.R.S.A. § 501(2-A), as requiring "just cause" for any discharge. (Pl. Response, PageID # 572.) Thus, Plaintiff argues that the CBA and the just-cited statute "triggers an employee's contract rights under the personnel policies and the administrative regulations." (<u>Id.</u>, PageID # 573.) Because Huard retired and was not terminated, there is simply no wrongful termination claim under 30-A M.R.S.A. § 501. However, even if the facts supported a violation of this Maine statute, the resulting claim is a statutory one, not a breach of contract claim. <u>See generally</u> <u>Gorham v. Androscoggin Cty.</u>, 21 A.3d 115, 117–18 (Me. 2011) (reviewing a claim under 30–A

---

[14] At least an excerpt of the Manual is contained in the summary judgment record at ECF No. 75-18.

[15] Copies of the applicable regulations are contained in the summary judgment record at ECF Nos. 71-16 & 71-17.

M.R.S.A. § 501 brought by a corrections officer who claimed he was wrongfully terminated). Second, to the extent any violation of the administrative regulations or KCCF policy and procedure manual trigger contractual rights under the CBA, any such claim would fall under the breach of contract theory pled as Count XI(A). In short, the Court concludes that Defendants are clearly entitled to summary judgment on Counts XI(B) & (C).

### 3. Statutory Discrimination Claims

Next, the Court's considers Plaintiff's statutory claims for employment discrimination. These claims include: (1) disability discrimination in violation of Title I of the Americans with Disabilities Act ( "ADA"), 42 U.S.C. § 12101 et seq., and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 et seq. (Count I), (2) gender discrimination in violation of the MHRA and Title VII (Count (VIII), (3) a hostile work environment in violation of the MHRA and Title VII (Count IX), and (4) sexual harassment in violation of the MHRA and Title VII (Count X).[16]

### a. Adverse Actions and the Continuing Violations Doctrine

All of the just-cited statutes that Plaintiff relies on for her claims of employment discrimination required her to file her administrative claim within 300 days. See, e.g., Burnett v. Ocean Properties, Ltd., 327 F. Supp. 3d 198, 231 (D. Me. 2018). In this case, because Huard filed her administrative claim on November 12, 2015, Defendants urge the Court to limit Huard's claims to actions that took place on or after January 1, 2015.

---

[16] To the extent Plaintiff states claims under both the applicable federal and state statutes, the Court need not engage in separate analysis of the federal and state claims. See, e.g., Roy, 914 F.3d at 62 ("A hostile work environment claim under the MHRA is concurrent with Title VII.") (internal citation and quotation omitted); Carnicella v. Mercy Hosp., 168 A.3d 768, 774 n.3 (Me. 2017) ("Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA.") (internal citation and quotation omitted).

In response to this argument, Plaintiffs assert that Huard's case should be analyzed using the continuing violations doctrine. "This doctrine, an equitable exception to Title VII's statute of limitations, 'allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims.'" Lockridge v. The Univ. Of Maine Sys., 597 F.3d 464, 474 (1st Cir. 2010) (quoting O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir.2001)). For this equitable doctrine to apply, Plaintiff must first establish that "a discriminatory 'anchoring act' occurred within the limitations period." Id. In this case, Plaintiff asserts that her "forced retirement" can serve as the "anchoring act" because it "amounted to a constructive discharge." (Pl. Response, PageID # 560.)

Thus, the Court must consider whether Huard's June 30, 2015 retirement amounts to a constructive discharge before it can determine whether to apply the continuing violation doctrine. As this Court has previously acknowledged, "'[c]onstructive discharge' is not a stand-alone cause of action but a way of satisfying the adverse action element of an employment discrimination claim." See Charette v. St. John Valley Soil & Water Conservation Dist., 332 F. Supp. 3d 316, 353–54 (D. Me. 2018) (citing Levesque v. Androscoggin Cty., 56 A.3d 1227, 1229 (Me. 2012)); see also Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 96-97 (1st Cir. 2018) (reviewing a retaliation claim based on constructive discharge).

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Green v. Brennan, 136 S. Ct. 1769, 1776 (2016) (quoting Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004)). Whether the intolerable conditions are created through

discriminatory action or a hostile work environment, the conditions must "become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins— thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world.") This means that "[c]onstructive discharge usually refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45 (1st Cir. 2003) (quotation marks omitted). "The standard is an objective one; an employee's subjective perceptions do not govern." Lee-Crespo, 354 F.3d at 45.

Viewing the evidence in the light most favorable to Plaintiff, the Court believes that Plaintiff has presented trialworthy evidence that she was constructively discharged in June of 2015. While constructive discharge must be gauged through the eyes of an objectively reasonable person, the Court acknowledges that on the facts presented it necessarily must consider the view of a reasonable person with similar physical limitations. Viewed through this lense, the evidence would allow a factfinder to conclude that Huard's employer withheld a medically-supported accommodation until she would agree to retire. Shortly after she committed to a retire, she was no longer scheduled to work overtime, which had been her consistently requested accommodation.

While Defendants argue that Huard's retirement cannot be viewed as a constructive discharge because it was "well-advertised" and "pre-planned," the evidence could allow a factfinder to conclude that Huard was forced into both the planning and the advertising of her departure in order to receive an accommodation that she needed. (Defs. Reply (ECF No. 81), PageID # 767.) Defendants also argue that Plaintiff's departure cannot be classified as a

constructive discharge because she "retired as originally planned" even though she worked no overtime after May 21, 2015 (Id.)  In Defendant's view, any arguably intolerable working conditions associated with the forced overtime dissipated in this forty-day period before her constructive discharge.  To be clear, a factfinder weighing all of the evidence might agree with these arguments.  However, viewing the current record in the light most favorable to Huard, it is not apparent that she was free to rescind her retirement announcement after May 21, 2015, and thereby continue working with a no-overtime accommodation.  Rather, an objective factfinder might alternatively conclude that if Huard rescinded her retirement she would have been forced back into the intolerable situation of working without any reasonable accommodations.  Ultimately, multiple genuine disputes of material fact, as well as associated credibility determinations, must be resolved in order to determine whether a reasonable person would have felt compelled to retire due to intolerable conditions when placed in Huard's shoes.

Having concluded that Huard has sufficient trialworthy evidence to use her forced retirement as an anchoring act, the Court returns to the question of whether and to what extent the continuing violations doctrine applies to Huard's various statutory claims and which, if any, claims can survive Defendant's Motion for Summary Judgment.

### b.  Gender Discrimination & Sexual Harassment (Counts VIII & X)

First, as Defendants point out in their Reply, in opposing Defendants' request for summary judgment Plaintiff "does not even discuss sexual harassment, likely because there is no evidence of it." (Defs. Reply, PageID # 769.)  In fact, in her Response, Plaintiff concedes "that there is insufficient evidence on the record to support her claim of gender discrimination." (Pl. Response, PageID # 565.)  The Court agrees with these characterizations of the record.  As a result, the Court grants summary judgment in favor of Defendants on Counts VIII & X.

### c. Disability Discrimination (Count I)

The Court construes Plaintiff's discrimination claims as pleading two different theories of disability discrimination: (1) that her disability caused Defendant to constructively discharge her, and (2) that Defendant failed to reasonably accommodate her disability. Defendants moved for summary judgment arguing that Huard did not experience an adverse action because of her disability and that they did reasonably accommodate Huard's disability.[17] (See Defs. Mot. (ECF No. 70), PageID # 447.)

In general, "[t]o withstand summary judgment on an ADA disability-discrimination claim, [the plaintiff] needs to show the existence of a genuine dispute of material fact as to all three elements of her prima facie case: (1) that she is disabled under the ADA; (2) that she is qualified to perform the essential functions of [her] job with or without reasonable accommodation; and (3) that she was discharged or otherwise adversely affected in whole or in part because of [her] disability." Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 126 (1st Cir. 2017) (internal quotations and citations omitted). The Court construes Defendants' Motion as arguing that Plaintiff cannot satisfy the third element of this prima facie case. Incorporating the earlier

---

[17] Defendants did not initially challenge whether Huard has a disability that substantially limits one or more of her major life activities. In their Reply, they include a footnote indicating that there is "no record evidence" regarding Plaintiff's disability and chastising Plaintiff for citing to the Complaint on this point in her Responsive Statement of Material Facts. See Defs. Reply, PageID # 768 & n.6. It is true that "a litigant may not rest upon mere allegations in, say, an unverified complaint . . . but must produce evidence which would be admissible at trial to make out the requisite issue of material fact." Fragoso v. Lopez, 991 F.2d 878, 887 (1st Cir. 1993). For this reason, the Court has disregarded any facts in Plaintiff's Statement of Material Facts that were supported solely by citation to the Amended Complaint. However, the record also includes multiple doctor's notes, some produced at the request of Kennebec County, that suggest Huard's issues with her lower extremities limited her ability to stand and work. Based on these exhibits, a factfinder could conclude that Huard is disabled, and that Kennebec County did perceive Huard as having a disability that qualified for accommodation. Given the lack of genuine dispute on the issue of disability and Defendants' failure to provide notice to Plaintiff that it was moving for summary judgment based on a lack of disability, the Court proceeds on the assumption that Plaintiff meets the initial disability requirement to state a trialworthy claim for disability discrimination.

constructive discharge analysis, the Court is satisfied that Plaintiff can satisfy the third element of her prima facie case on the record presented.

Likewise, the Court finds that Defendant can produce evidence that the legitimate, non-discriminatory reason for Huard's departure was simply that it accepted her decision to retire. See Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 313 (1st Cir. 2017) (explaining that an employer may "rebut this presumption by pointing to evidence of a legitimate, non-discriminatory reason for the challenged conduct.") Under the burden-shifting framework, the Court then looks to whether Plaintiff has trialworthy "evidence that [defendant's] explanation is pretextual and that discriminatory animus prompted the adverse action." Cherkaoui v. City of Quincy, 877 F.3d 14, 24 (1st Cir. 2017) (citing Garmon, 844 F.3d at 313.) In the Court's assessment, Plaintiff crosses this hurdle when the totality of the record is viewed in the light most favorable to Huard. Most significantly, a factfinder could credit Huard's testimony about her April 2015 meeting with Sheriff Liberty. Thus, the Court concludes that Defendants are not entitled to summary judgment on Plaintiff's constructive discharge theory of disability discrimination.

Turning to Plaintiff's alternative failure-to-accommodate theory of disability discrimination, "a plaintiff must show that: (1) [s]he is a [disabled] person within the meaning of the Act; (2) [s]he is nonetheless qualified to perform the essential functions of the job (with or without reasonable accommodation); and (3) the employer knew of the disability but declined to reasonably accommodate it upon request." Sepúlveda-Vargas v. Caribbean Restaurants, LLC, 888 F.3d 549, 553 (1st Cir. 2018). Here, Defendants point to the undisputed evidence that Kennebec County provided Huard her requested reasonable accommodation beginning May 22, 2015, which Defendants note was "eight days after a specialist indicated Huard was not able to work overtime." (Defs. Mot., PageID # 449.) In Defendants' view, Huard's requested accommodation was delayed,

but not denied.  The First Circuit has indicated that either an "unreasonable delay" or "an employer's failure to engage in an informal interactive process following an employee's request" can amount to "a failure to provide reasonable accommodations" <u>Valle-Arce v. Puerto Rico Ports Auth.</u>, 651 F.3d 190, 200-01 (1st Cir. 2011).  Given this precedent and the record before the Court, it appears there is a genuine factual dispute regarding the reasonableness of any delay or whether Kennebec County was engaged in a "good faith" interactive process with Huard in the early half of 2015.  <u>E.E.O.C. v. Kohl's Dep't Stores, Inc.</u>, 774 F.3d 127, 132 (1st Cir. 2014)  ("[I]t is imperative that both the employer and the employee have a duty to engage in good faith, and that empty gestures on the part of the employer will not satisfy the good faith standard.")  A reasonable factfinder might well resolve this issue in favor of the employer.  However, the Court is unable to resolve such factual disputes on summary judgment.

Therefore, the Court concludes that Count I survives summary judgment in its entirety.

### d. Hostile Work Environment (Count IX)

Huard states a separate count for disability harassment based on a hostile work environment.[18]  "To succeed, a hostile work environment claim requires, in addition to proof of other elements, evidence that the discriminatory conduct was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment."  <u>Murray v. Warren Pumps, LLC</u>, 821 F.3d 77, 86 (1st Cir. 2016) (internal quotations and citations omitted). The Supreme Court has recognized that "[a] hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working

---

[18] Defendant initially argues that the "First Circuit has not recognized a hostile work environment claims based on disability.  <u>See</u> Def. Mot., PageID # 452 (citing <u>Rocafort v. IBM Corp.</u>, 334 F.3d 115, 121 (1st Cir. 2003).  While Defendant's argument correctly summarizes <u>Rocafort</u>, more recent First Circuit opinions seem to suggest that a viable ADA claim might be pursued under a hostile work environment theory.  <u>See, e.g.</u>, <u>Murray v. Warren Pumps, LLC</u>, 821 F.3d 77, 86 & n.1 (1st Cir. 2016) (citing <u>Quiles–Quiles v. Henderson</u>, 439 F.3d 1, 5-7 & n.1 (1st Cir.2006) & <u>Colón–Fontánez v. Municipality of San Juan</u>, 660 F.3d 17, 43–44 (1st Cir.2011)).

conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004); see also Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 28 (1st Cir. 2002) ("[T]he fact that the plaintiff endured a hostile work environment—without more—will not always support a finding of constructive discharge.")

While Plaintiff maintains "she experienced a hostile work environment as far back as 2012," the first hint in the record that Huard had a disability dates to 2014. Focusing on this time period in which it was apparent that others knew of Huard's feet and leg issues, the Court fails to see trialworthy evidence that an abusive work environment compelled Huard's retirement. Cf. Fox v. Costco Wholesale Corp., No. 17-0936-CV, -- F.3d ---, 2019 WL 1050643, at *8 (2d Cir. Mar. 6, 2019) (finding "an issue of fact as to whether the frequency and severity of the [disability-related] mockery rise to the level of an objectively hostile work environment"). Huard herself maintains that the "only" reason she retired in 2015 was the forced overtime, "which was causing [her] a great deal of pain and swelling in my feet and legs." (Huard Aff., PageID # 599.) Beyond the failure to accommodate and requiring Huard to work fourteen overtime shifts in early 2015, Huard has not put forward severe or pervasive conduct that relates to her disability. See, e.g., Hill v. Assocs. for Renewal in Educ., Inc., 897 F.3d 232, 237 (D.C. Cir. 2018), cert. denied, No. 18-7112, 2019 WL 660201 (Feb. 19, 2019) (concluding that evidence of failure to accommodate was not "the kind of 'extreme' conditions that this Court and the Supreme Court have found to constitute a hostile work environment"). Therefore, the Court finds that Defendants are entitled to summary judgment on Count IX.

#### 4. Statutory Retaliation Claims (Counts II & III)

In Counts II and III of the Amended Complaint, Plaintiff presents two separate theories of retaliation: (1) retaliation in violation of the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. § 833(1)(A) (Count III), and (2) retaliation for opposing practices in violation of the MHRA and 42 U.S.C. § 2000e et seq. ("Title VII") (Count II).[19]  In order to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected conduct under the applicable statute; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct.  See Rivera-Rivera, 898 F.3d at 94; see also Pippin v. Boulevard Motel Corp., 835 F.3d 180, 183 (1st Cir. 2016) (discussing the same elements for MWPA).

As to Huard's MWPA claim, Defendants argue they are entitled to summary judgment because (1) there was no "whistleblowing activity" within the required 300-day time period and (2) there is no evidence to establish a causal connection between any "whistleblowing activity" and any actionable adverse action Huard experienced.  On the first point, Defendants are clearly correct that there is no evidence that Huard engaged in protected whistleblowing activity on or after January 1, 2015.  The most recent activity in the record that qualifies as whistleblowing activity is Huard's April 2014 report regarding biohazard equipment.  Nonetheless, Plaintiff maintains this report is casually connected to her June 30, 2015 constructive discharge.

"To demonstrate a causal link sufficient to defeat a summary judgment motion, . . . [Plaintiff] must make a sufficient evidentiary showing that her protected whistleblowing activity

---

[19] As this Court has previously noted, the judicial remedy for a violation of the MWPA is a cause of action under the MHRA.  Nonetheless, "the prevailing case law . . . outlines different standards for evaluating retaliation claims based on statutorily defined [MWPA] whistleblowing activity on the one hand and general opposition to practices in violation of the MHRA on the other."  Charette v. St. John Valley Soil & Water Conservation Dist., 332 F. Supp. 3d 316, 356 n. 40 & 41 (D. Me. 2018).

was a but-for cause of her dismissal." Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 349 (1st Cir. 2018) (citing Caruso v. Jackson Lab, 98 A.3d 221, 226-27 (Me. 2014)). Even construing the record in the light most favorable to Huard, there simply is not evidence that Huard's forced retirement "was motivated at least in part by protected activity." Id. at 351. Here, Plaintiff's best attempt at a causal connection is found in the Amended Complaint, in which she alleges that her "employer began forcing her into overtime, despite the pain it caused her" after reports of "unsafe working conditions." (Am. Compl. (ECF No. 3), PageID # 81.) However, the summary judgment record consists of an April 2014 report regarding biohazard equipment and then a first overtime shift on March 30, 2015. It is also undisputed that Kennebec County responded to the biohazard report by ordering new equipment within a week. It is similarly undisputed that when Huard made her first documented complaint regarding her medical issues being aggravated by control room work, she was reassigned. Thus, beyond the lack of temporal proximity between her whistleblowing activity and her alleged constructive discharge, the evidence is that Kennebec County was responsive to her April 2014 safety complaint and her May 2014 informal request for accommodations. On the record presented, the Court finds no probative evidence that Huard's forced retirement or even the required overtime in 2015 would not have occurred but for this April 2014 protected report. In short, the Court does not find that the record would allow a factfinder to make the necessary link between Huard's report in 2014 and her retirement in 2015. In light of this lack of trialworthy causal connection evidence, the Court concludes Defendants are entitled to summary judgment on Count III.

As to Huard's other retaliation claim, Defendants press similar arguments for summary judgment. However, the relevant statutes for these claims protect Huard from retaliation for "opposing any act or practice that is unlawful under the [MHRA]," 5 M.R.S.A. § 4633(1), or

"oppos[ing] any practice made an unlawful employment practice by [Title VII]," 42 U.S.C. § 2000e-3. In short, given the coverage of the applicable statutes and the manner in which this retaliation claim was pled in the Amended Complaint, the Court construes this retaliation claim to cover a wider swath of activity, including Huard's participation as a union shop steward in representing a corrections officer making claims of discrimination. This activity by Huard extended into 2015 and overlapped with the time period in which Defendants refused to accept Huard's medically supported request to be excused from overtime work.[20] Thus, this retaliation claim presents with a temporal proximity that is lacking in Huard's MWPA claim.[21] Additionally, while Defendants claim that their efforts to verify Huard's need for a no-overtime accommodation are simply in accordance with their basic human resource procedures, the Court believes that there is sufficient evidence in the record from which a factfinder could conclude that this expressed reason is pretext. Among the evidence that supports this conclusion is: (1) Defendants' refusal to accept the initial report from Concentra, its own hired independent medical examiner, when the examiner initially recommended continuing with the existing restriction and (2) the failure to tell Huard early-on what documentation would be deemed sufficient for her requested accommodation. Most critically, crediting Huard's assertion that the Sheriff offered her a limited overtime accommodation in exchange for setting a firm retirement date in April 2015, a factfinder could then infer that the County's claim that it simply wanted to verify what accommodations

---

[20] Defendants have admitted for purposes of summary judgment that "[i]n 2014 and 2015, Huard represented a corrections officer who was the target of severe discrimination, sexual harassment, and hostile work environment in several meetings with Cyr, Gardner, and Campbell." (Def. Reply SMF (ECF No. 82), PageID # 779.) Given this broad admission, the Court takes judicial notice of the facts laid out in its contemporaneously filed order on summary judgment in DiGiacomo v. Kennebec County et al. (D. Me. Docket # 1:18-cv-163-GZS), which contains further details of Huard's role in DiGiacomo's complaints and the timing of those complaints.

[21] On the issue of temporal proximity, it is notable that Huard had obtained a doctor's note that recommended a one year no-overtime accommodation in June 2014. Rather than wait until June 2015, Kennebec County began a re-examination on Huard's need for accommodations in February 2015.

Huard needed in early 2015 was pretext and that the early and extended verification process, along with the forced overtime during that process, were undertaken in retaliation. Ultimately, whether the retaliation was motivated by Huard's ongoing participation in opposing unlawful employment practices is a question that can only be answered by weighing the credibility of the witnesses involved; as such, the Court concludes that Count II cannot be resolved via summary judgment.

**III.     CONCLUSION**

For the reasons just stated, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion for Judgment on the Pleadings and for Summary Judgment (ECF No. 70). To summarize, judgment shall be entered in favor of the Individual Defendants on all claims and for the Kennebec County Defendants on Counts III, VIII, IX, X, XI, XIII, XIV, XV & XVI. Plaintiff's claims for retaliation and disability discrimination against the Kennebec County Defendants, as stated in Counts I & II, shall be placed on the next available trial list.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 19th day of March, 2019.